ROGERS ET AL. *v.* LODGE ET AL.

No. 80–2100.  Argued February 23, 1982—Decided July 1, 1982

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined. POWELL, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 628. STEVENS, J., filed a dissenting opinion, *post*, p. 631.

*E. Freeman Leverett* argued the cause for appellants. With him on the briefs was *Preston B. Lewis.*

*David F. Walbert* argued the cause for appellees. With him on the brief were *Robert W. Cullen, Laughlin McDonald, Christopher Coates,* and *Neil Bradley.**

JUSTICE WHITE delivered the opinion of the Court.

The issue in this case is whether the at-large system of elections in Burke County, Ga., violates the Fourteenth Amendment rights of Burke County's black citizens.

## I

Burke County is a large, predominately rural county located in eastern Georgia. Eight hundred and thirty-one square miles in area,[1] it is approximately two-thirds the size of the State of Rhode Island. According to the 1980 census, Burke County had a total population of 19,349, of whom 10,385, or 53.6%, were black.[2] The average age of blacks

---

*Briefs of *amici curiae* urging affirmance were filed by *Arthur Kinoy* and *Robert Boehm* for the Center for Constitutional Rights; by *Marvin S. Arrington, Bobby L. Hill, John R. Myer,* and *Margrett Ford* for the Georgia Association of Black Elected Officials et al.; by *William L. Robinson* and *Frank R. Parker* for the Lawyers' Committee for Civil Rights Under Law; and by *Jack Greenberg, James M. Nabrit III,* and *Lani Guinier* for the NAACP Legal Defense and Educational Fund, Inc., et al.

[1] U. S. Dept. of Commerce, Bureau of the Census, County and City Data Book 1977, p. 90 (1978).

[2] U. S. Dept. of Commerce, Bureau of the Census, 1980 Census of Population and Housing, PHC80–V–12, p. 5 (Mar. 1981). In 1930, Burke County had a total population of 29,224, of whom 22,698 or 78% were black.

living there is lower than the average age of whites and therefore whites constitute a slight majority of the voting age population. As of 1978, 6,373 persons were registered to vote in Burke County, of whom 38% were black.[3]

The Burke County Board of Commissioners governs the county. It was created in 1911, see 1911 Ga. Laws 310–311, and consists of five members elected at large to concurrent 4-year terms by all qualified voters in the county. The county has never been divided into districts, either for the purpose of imposing a residency requirement on candidates or for the purpose of requiring candidates to be elected by voters residing in a district. In order to be nominated or elected, a candidate must receive a majority of the votes cast in the primary or general election, and a runoff must be held if no candidate receives a majority in the first primary or general election. Ga. Code § 34–1513 (Supp. 1980). Each candidate must run for a specific seat on the Board, Ga. Code § 34–1015 (1978), and a voter may vote only once for any candidate. No Negro has ever been elected to the Burke County Board of Commissioners.

Appellees, eight black citizens of Burke County, filed this suit in 1976 in the United States District Court for the Southern District of Georgia. The suit was brought on behalf of all black citizens in Burke County. The class was certified in 1977. The complaint alleged that the county's system of at-large elections violates appellees' First, Thirteenth, Fourteenth, and Fifteenth Amendment rights, as well as their rights under 42 U. S. C. §§ 1971, 1973, and 1983, by diluting the voting power of black citizens. Following a bench trial at which both sides introduced extensive evidence, the court issued an order on September 29, 1978, stating that appellees were entitled to prevail and ordering that Burke County be

---

U. S. Dept. of Commerce, Bureau of the Census, II Characteristics of the Population, pt. 2, p. 229 (1943). The percentage of blacks in the total population of Burke County has steadily diminished over the last 50 years.

[3] App. to Juris. Statement 72a.

divided into five districts for purposes of electing County Commissioners. App. to Juris. Statement 62a. The court later issued detailed findings of fact and conclusions of law in which it stated that while the present method of electing County Commissioners was "racially neutral when adopted, [it] is being *maintained* for invidious purposes" in violation of appellees' Fourteenth and Fifteenth Amendment rights. *Id.,* at 71a, 96a.

The Court of Appeals affirmed. *Lodge* v. *Buxton,* 639 F. 2d 1358 (CA5 1981). It stated that while the proceedings in the District Court took place prior to the decision in *Mobile* v. *Bolden,* 446 U. S. 55 (1980), the District Court correctly anticipated *Mobile* and required appellees to prove that the at-large voting system was maintained for a discriminatory purpose. 639 F. 2d, at 1375–1376. The Court of Appeals also held that the District Court's findings were not clearly erroneous, and that its conclusion that the at-large system was maintained for invidious purposes was "virtually mandated by the overwhelming proof." *Id.,* at 1380. We noted probable jurisdiction, 454 U. S. 811 (1981), and now affirm.[4]

## II

At-large voting schemes and multimember districts tend to minimize the voting strength of minority groups by permitting the political majority to elect *all* representatives of the district. A distinct minority, whether it be a racial, ethnic, economic, or political group, may be unable to elect any representatives in an at-large election, yet may be able to elect several representatives if the political unit is divided into single-member districts. The minority's voting power in a multimember district is particularly diluted when bloc voting occurs and ballots are cast along strict majority-minority lines. While multimember districts have been challenged for

---

[4] The District Court's judgment was stayed pending appeal to the Court of Appeals. 439 U. S. 948 (1978). The Court of Appeals stayed its mandate on April 6, 1981, pending disposition of the case here.

"their winner-take-all aspects, their tendency to submerge minorities and to overrepresent the winning party," *Whitcomb* v. *Chavis*, 403 U. S. 124, 158–159 (1971), this Court has repeatedly held that they are not unconstitutional *per se*. *Mobile* v. *Bolden, supra,* at 66; *White* v. *Regester*, 412 U. S. 755, 765 (1973); *Whitcomb* v. *Chavis, supra,* at 142. The Court has recognized, however, that multimember districts violate the Fourteenth Amendment if "conceived or operated as purposeful devices to further racial discrimination" by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population. *Whitcomb* v. *Chavis, supra,* at 149. See also *White* v. *Regester, supra,* at 765. Cases charging that multimember districts unconstitutionally dilute the voting strength of racial minorities are thus subject to the standard of proof generally applicable to Equal Protection Clause cases. *Washington* v. *Davis*, 426 U. S. 229 (1976), and *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252 (1977), made it clear that in order for the Equal Protection Clause to be violated, "the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Washington* v. *Davis, supra,* at 240. Neither case involved voting dilution, but in both cases the Court observed that the requirement that racially discriminatory purpose or intent be proved applies to voting cases by relying upon, among others, *Wright* v. *Rockefeller*, 376 U. S. 52 (1964), a districting case, to illustrate that a showing of discriminatory intent has long been required in *all* types of equal protection cases charging racial discrimination. *Arlington Heights, supra,* at 265; *Washington* v. *Davis, supra,* at 240.[5]

---

[5] Purposeful racial discrimination invokes the strictest scrutiny of adverse differential treatment. Absent such purpose, differential impact is subject only to the test of rationality. *Washington* v. *Davis*, 426 U. S., at 247–248.

618

■■■■■■■■■■■■■■■■■■■■

*Arlington Heights* and *Washington* v. *Davis* both rejected the notion that a law is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another. *Arlington Heights, supra,* at 265; *Washington* v. *Davis,* 426 U. S., at 242. However, both cases recognized that discriminatory intent need not be proved by direct evidence. "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Ibid.* Thus determining the existence of a discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights, supra,* at 266.

In *Mobile* v. *Bolden, supra,* the Court was called upon to apply these principles to the at-large election system in Mobile, Ala. Mobile is governed by three commissioners who exercise all legislative, executive, and administrative power in the municipality. 446 U. S., at 59. Each candidate for the City Commission runs for one of three numbered posts in an at-large election and can only be elected by a majority vote. *Id.,* at 59–60. Plaintiffs brought a class action on behalf of all Negro citizens of Mobile alleging that the at-large scheme diluted their voting strength in violation of several statutory and constitutional provisions. The District Court concluded that the at-large system "violates the constitutional rights of the plaintiffs by improperly restricting their access to the political process," *Bolden* v. *Mobile,* 423 F. Supp. 384, 399 (SD Ala. 1976), and ordered that the commission form of government be replaced by a mayor and a nine-member City Council elected from single-member districts. *Id.,* at 404. The Court of Appeals affirmed. 571 F. 2d 238 (CA5 1978). This Court reversed.

Justice Stewart, writing for himself and three other Justices, noted that to prevail in their contention that the at-large voting system violates the Equal Protection Clause of the Fourteenth Amendment, plaintiffs had to prove the

system was "'conceived or operated as [a] purposeful devic[e] to further racial . . . discrimination.'" 446 U. S., at 66, quoting *Whitcomb* v. *Chavis, supra,* at 149.[6]   Such a requirement "is simply one aspect of the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment," 446 U. S., at 66, and *White* v. *Regester* is consistent with that principle.   446 U. S., at 69.   Another Justice agreed with the standard of proof recognized by the plurality.   *Id.,* at 101 (WHITE, J., dissenting).

The plurality went on to conclude that the District Court had failed to comply with this standard.   The District Court had analyzed plaintiffs' claims in light of the standard which had been set forth in *Zimmer* v. *McKeithen,* 485 F. 2d 1297 (CA5 1973), aff'd on other grounds *sub nom. East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636 (1975) *(per curiam).*[7]   *Zimmer* set out a list of factors[8] gleaned from

---

[6] With respect to the Fifteenth Amendment, the plurality held that the Amendment prohibits only direct, purposefully discriminatory interference with the freedom of Negroes to vote.   "Having found that Negroes in Mobile 'register and vote without hindrance,' the District Court and Court of Appeals were in error in believing that the appellants invaded the protection of [the Fifteenth] Amendment in the present case." *Mobile* v. *Bolden,* 446 U. S., at 65.   Three Justices disagreed with the plurality's basis for putting aside the Fifteenth Amendment.   *Id.,* at 84, n. 3 (STEVENS, J., concurring in judgment); *id.,* at 102 (WHITE, J., dissenting); *id.,* at 125–135 (MARSHALL, J., dissenting).   We express no view on the application of the Fifteenth Amendment to this case.

The plurality noted that plaintiffs' claim under § 2 of the Voting Rights Act, 79 Stat. 437, as amended, 42 U. S. C. § 1973, added nothing to their Fifteenth Amendment claim because the "legislative history of § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself."   446 U. S., at 60–61.

[7] We specifically affirmed the judgment below "without approval of the constitutional views expressed by the Court of Appeals."   424 U. S., at 638.

[8] The primary factors listed in *Zimmer* include a lack of minority access to the candidate selection process, unresponsiveness of elected officials to minority interests, a tenuous state policy underlying the preference for

*Whitcomb* v. *Chavis, supra,* and *White* v. *Regester, supra,* that a court should consider in assessing the constitutionality of at-large and multimember district voting schemes. Under *Zimmer,* voting dilution is established "upon proof of the existence of an aggregate of these factors." 485 F. 2d, at 1305.

The plurality in *Mobile* was of the view that *Zimmer* was "decided upon the misunderstanding that it is not necessary to show a discriminatory purpose in order to prove a violation of the Equal Protection Clause—that proof of a discriminatory effect is sufficient." 446 U. S., at 71. The plurality observed that while "the presence of the indicia relied on in *Zimmer* may afford some evidence of a discriminatory purpose," the mere existence of those criteria is not a substitute for a finding of discriminatory purpose. *Id.,* at 73. The District Court's standard in *Mobile* was likewise flawed. Finally, the plurality concluded that the evidence upon which the lower courts had relied was "insufficient to prove an unconstitutionally discriminatory purpose in the present case." *Ibid.* JUSTICE STEVENS rejected the intentional discrimination standard but concluded that the proof failed to satisfy the legal standard that in his view was the applicable rule. He therefore concurred in the judgment of reversal. Four other Justices, however, thought the evidence sufficient to satisfy the purposeful discrimination standard. One of them, JUSTICE BLACKMUN, nevertheless concurred in the Court's judgment because he believed an erroneous remedy had been imposed.

Because the District Court in the present case employed the evidentiary factors outlined in *Zimmer,* it is urged that

multimember or at-large districting, and the existence of past discrimination which precludes effective participation in the electoral process. 485 F. 2d, at 1305. Factors which enhance the proof of voting dilution are the existence of large districts, anti-single-shot voting provisions, and the absence of any provision for at-large candidates to run from geographic subdistricts. *Ibid.*

its judgment is infirm for the same reasons that led to the reversal in *Mobile*. We do not agree. First, and fundamentally, we are unconvinced that the District Court in this case applied the wrong legal standard. Not only was the District Court's decision rendered a considerable time after *Washington* v. *Davis* and *Arlington Heights*, but the trial judge also had the benefit of *Nevett* v. *Sides*, 571 F. 2d 209 (1978), where the Court of Appeals for the Fifth Circuit assessed the impact of *Washington* v. *Davis* and *Arlington Heights* and held that "a showing of racially motivated discrimination is a necessary element in an equal protection voting dilution claim . . . ." 571 F. 2d, at 219. The court stated that "[t]he ultimate issue in a case alleging unconstitutional dilution of the votes of a racial group is whether the districting plan under attack exists because it was intended to diminish or dilute the political efficacy of that group." *Id.*, at 226. The Court of Appeals also explained that although the evidentiary factors outlined in *Zimmer* were important considerations in arriving at the ultimate conclusion of discriminatory intent, the plaintiff is not limited to those factors. "The task before the fact finder is to determine, under all the relevant facts, in whose favor the 'aggregate' of the evidence preponderates. This determination is peculiarly dependent upon the facts of each case." 571 F. 2d, at 224 (footnote omitted).

The District Court referred to *Nevett* v. *Sides* and demonstrated its understanding of the controlling standard by observing that a determination of discriminatory intent is "a requisite to a finding of unconstitutional vote dilution" under the Fourteenth and Fifteenth Amendments. App. to Juris. Statement 68a. Furthermore, while recognizing that the evidentiary factors identified in *Zimmer* were to be considered, the District Court was aware that it was "not limited in its determination only to the *Zimmer* factors" but could consider other relevant factors as well. App. to Juris. Statement 70a. The District Court then proceeded to deal with what it considered to

be the relevant proof and concluded that the at-large scheme of electing commissioners, "although racially neutral when adopted, is being *maintained* for invidious purposes." *Id.*, at 71a. That system "while neutral in origin . . . has been subverted to invidious purposes." *Id.*, at 90a. For the most part, the District Court dealt with the evidence in terms of the factors set out in *Zimmer* and its progeny, but as the Court of Appeals stated:

> "Judge Alaimo employed the constitutionally required standard . . . [and] did not treat the *Zimmer* criteria as absolute, but rather considered them only to the extent they were relevant to the question of discriminatory intent." 639 F. 2d, at 1376.

Although a tenable argument can be made to the contrary, we are not inclined to disagree with the Court of Appeals' conclusion that the District Court applied the proper legal standard.

## III

### A

We are also unconvinced that we should disturb the District Court's finding that the at-large system in Burke County was being maintained for the invidious purpose of diluting the voting strength of the black population. In *White* v. *Regester*, 412 U. S., at 769–770, we stated that we were not inclined to overturn the District Court's factual findings, "representing as they do a blend of history and an intensely local appraisal of the design and impact of the Bexar County multimember district in the light of past and present reality, political and otherwise." See also *Columbus Board of Education* v. *Penick*, 443 U. S. 449, 468 (1979) (BURGER, C. J., concurring in judgment). Our recent decision in *Pullman-Standard* v. *Swint*, 456 U. S. 273 (1982), emphasizes the deference Federal Rule of Civil Procedure 52 requires reviewing courts to give a trial court's findings of fact. "Rule 52(a) broadly requires that findings of fact not be set aside unless

clearly erroneous. It does not make exceptions or purport to exclude certain categories of factual findings . . . ." 456 U. S., at 287. The Court held that the issue of whether the differential impact of a seniority system resulted from an intent to discriminate on racial grounds "is a pure question of fact, subject to Rule 52(a)'s clearly-erroneous standard." *Id.*, at 287–288. The *Swint* Court also noted that issues of intent are commonly treated as factual matters. *Id.*, at 288. We are of the view that the same clearly-erroneous standard applies to the trial court's finding in this case that the at-large system in Burke County is being maintained for discriminatory purposes, as well as to the court's subsidiary findings of fact. The Court of Appeals did not hold any of the District Court's findings of fact to be clearly erroneous, and this Court has frequently noted its reluctance to disturb findings of fact concurred in by two lower courts. See, *e. g.*, *Berenyi* v. *Information Director*, 385 U. S. 630, 635 (1967); *Blau* v. *Lehman*, 368 U. S. 403, 408–409 (1962); *Graver Tank & Mfg. Co.* v. *Linde Co.*, 336 U. S. 271, 275 (1949). We agree with the Court of Appeals that on the record before us, none of the factual findings are clearly erroneous.

## B

The District Court found that blacks have always made up a substantial majority of the population in Burke County, App. to Juris. Statement 66a, n. 3, but that they are a distinct minority of the registered voters. *Id.*, at 71a–72a. There was also overwhelming evidence of bloc voting along racial lines. *Id.*, at 72a–73a. Hence, although there had been black candidates, no black had ever been elected to the Burke County Commission. These facts bear heavily on the issue of purposeful discrimination. Voting along racial lines allows those elected to ignore black interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race. Because it is sensible to expect that at least some

blacks would have been elected in Burke County, the fact that none have ever been elected is important evidence of purposeful exclusion. See *White* v. *Regester, supra*, at 766.

Under our cases, however, such facts are insufficient in themselves to prove purposeful discrimination absent other evidence such as proof that blacks have less opportunity to participate in the political processes and to elect candidates of their choice. *United Jewish Organizations* v. *Carey*, 430 U. S. 144, 167 (1977); *White* v. *Regester, supra*, at 765–766; *Whitcomb* v. *Chavis*, 403 U. S., at 149–150. See also *Mobile* v. *Bolden*, 446 U. S., at 66 (plurality opinion). Both the District Court and the Court of Appeals thought the supporting proof in this case was sufficient to support an inference of intentional discrimination. The supporting evidence was organized primarily around the factors which *Nevett* v. *Sides*, 571 F. 2d 209 (CA5 1978), had deemed relevant to the issue of intentional discrimination. These factors were primarily those suggested in *Zimmer* v. *McKeithen*, 485 F. 2d 1297 (CA5 1973).

The District Court began by determining the impact of past discrimination on the ability of blacks to participate effectively in the political process. Past discrimination was found to contribute to low black voter registration because, prior to the Voting Rights Act of 1965, blacks had been denied access to the political process by means such as literacy tests, poll taxes, and white primaries. The result was that "Black suffrage in Burke County was virtually non-existent." App. to Juris. Statement 71a. Black voter registration in Burke County has increased following the Voting Rights Act to the point that some 38% of blacks eligible to vote are registered to do so. *Id.*, at 72a. On that basis the District Court inferred that "past discrimination has had an adverse effect on black voter registration which lingers to this date." *Ibid.* Past discrimination against blacks in education also had the same effect. Not only did Burke County schools discriminate against blacks as recently as 1969, but also some schools

still remain essentially segregated and blacks as a group have completed less formal education than whites. *Id.*, at 74a.

The District Court found further evidence of exclusion from the political process. Past discrimination had prevented blacks from effectively participating in Democratic Party affairs and in primary elections. Until this lawsuit was filed, there had never been a black member of the County Executive Committee of the Democratic Party. There were also property ownership requirements that made it difficult for blacks to serve as chief registrar in the county. There had been discrimination in the selection of grand jurors, the hiring of county employees, and in the appointments to boards and committees which oversee the county government. *Id.*, at 74a–76a. The District Court thus concluded that historical discrimination had restricted the present opportunity of blacks effectively to participate in the political process. Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo.

Extensive evidence was cited by the District Court to support its finding that elected officials of Burke County have been unresponsive and insensitive to the needs of the black community,[9] which increases the likelihood that the political process was not equally open to blacks. This evidence ranged from the effects of past discrimination which still

---

[9] The Court of Appeals held that "proof of unresponsiveness by the public body in question to the group claiming injury" is an *essential* element of a claim of voting dilution under the Fourteenth Amendment. 639 F. 2d, at 1375. Under our cases, however, unresponsiveness is an important element but only one of a number of circumstances a court should consider in determining whether discriminatory purpose may be inferred.

haunt the county courthouse to the infrequent appointment of blacks to county boards and committees; the overtly discriminatory pattern of paving county roads; the reluctance of the county to remedy black complaints, which forced blacks to take legal action to obtain school and grand jury desegregation; and the role played by the County Commissioners in the incorporation of an all-white private school to which they donated public funds for the purchase of band uniforms. *Id.*, at 77a–82a.

The District Court also considered the depressed socioeconomic status of Burke County blacks. It found that proportionately more blacks than whites have incomes below the poverty level. *Id.*, at 83a. Nearly 53% of all black families living in Burke County had incomes equal to or less than three-fourths of a poverty-level income. *Ibid.* Not only have blacks completed less formal education than whites, but also the education they have received "was qualitatively inferior to a marked degree." *Id.*, at 84a. Blacks tend to receive less pay than whites, even for similar work, and they tend to be employed in menial jobs more often than whites. *Id.*, at 85a. Seventy-three percent of houses occupied by blacks lacked all or some plumbing facilities; only 16% of white-occupied houses suffered the same deficiency. *Ibid.* The District Court concluded that the depressed socioeconomic status of blacks results in part from "the lingering effects of past discrimination." *Ibid.*

Although finding that the state policy behind the at-large electoral system in Burke County was "neutral in origin," the District Court concluded that the policy "has been subverted to invidious purposes." *Id.*, at 90a. As a practical matter, maintenance of the state statute providing for at-large elections in Burke County is determined by Burke County's state representatives, for the legislature defers to their wishes on matters of purely local application. The court found that Burke County's state representatives "have retained a system which has minimized the ability of Burke County Blacks to participate in the political system." *Ibid.*

The trial court considered, in addition, several factors which this Court has indicated enhance the tendency of multimember districts to minimize the voting strength of racial minorities. See *Whitcomb* v. *Chavis*, 403 U. S., at 143–144. It found that the sheer geographic size of the county, which is nearly two-thirds the size of Rhode Island, "has made it more difficult for Blacks to get to polling places or to campaign for office." App. to Juris. Statement 91a. The court concluded, as a matter of law, that the size of the county tends to impair the access of blacks to the political process. *Id.*, at 92a. The majority vote requirement, Ga. Code § 34–1513 (Supp. 1980), was found "to submerge the will of the minority" and thus "deny the minority's access to the system." App. to Juris. Statement 92a. The court also found the requirement that candidates run for specific seats, Ga. Code § 34–1015 (1978), enhances appellees' lack of access because it prevents a cohesive political group from concentrating on a single candidate. Because Burke County has no residency requirement, "[a]ll candidates could reside in Waynesboro, or in 'lilly-white' *[sic]* neighborhoods. To that extent, the denial of access becomes enhanced." App. to Juris. Statement 93a.

None of the District Court's findings underlying its ultimate finding of intentional discrimination appears to us to be clearly erroneous; and as we have said, we decline to overturn the essential finding of the District Court, agreed to by the Court of Appeals, that the at-large system in Burke County has been maintained for the purpose of denying blacks equal access to the political processes in the county. As in *White* v. *Regester*, 412 U. S., at 767, the District Court's findings were "sufficient to sustain [its] judgment . . . and, on this record, we have no reason to disturb them."

## IV

We also find no reason to overturn the relief ordered by the District Court. Neither the District Court nor the Court of Appeals discerned any special circumstances that would mili-

tate against utilizing single-member districts. Where "a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the 'condition that offends the Constitution.'" *Milliken* v. *Bradley*, 433 U. S. 267, 282 (1977) (emphasis deleted), quoting *Milliken* v. *Bradley*, 418 U. S. 717, 738 (1974).[10]

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL, with whom JUSTICE REHNQUIST joins, dissenting.

I

*Mobile* v. *Bolden*, 446 U. S. 55 (1980), establishes that an at-large voting system must be upheld against constitutional attack unless maintained for a discriminatory purpose. In *Mobile* we reversed a finding of unconstitutional vote dilution because the lower courts had relied on factors insufficient as a matter of law to establish discriminatory intent. See *id.*, at 73 (plurality opinion of Stewart, J.). The District Court and Court of Appeals in this case based their findings of unconstitutional discrimination on the same factors held insufficient in *Mobile*. Yet the Court now finds their conclusion unexceptionable. The *Mobile* plurality also affirmed

---

[10] Appellants contend that the District Court should not have divided Burke County into five districts but should have allowed appellants to devise a plan for subdividing the county and to submit their plan for preclearance under § 5 of the Voting Rights Act, 79 Stat. 439, as amended, 42 U. S. C. § 1973c. This contention was not properly raised in the Court of Appeals and was not addressed by that court. We therefore do not address it. See *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 147, n. 2 (1970).

Appellants also contend that the doctrine of unconstitutional dilution of voting rights arising from an at-large election system does not apply to county governing bodies. We find no merit to this contention, having previously affirmed a judgment that at-large elections for the governing body of a parish (county) unconstitutionally diluted black voting strength. *East Carroll Parish School Bd.* v. *Marshall*, 424 U. S. 636 (1976).

that the concept of "intent" was no mere fiction, and held that the District Court had erred in "its failure to identify the state officials whose intent it considered relevant." *Id.*, at 74, n. 20. Although the courts below did not answer that question in this case, the Court today affirms their decision.

Whatever the wisdom of *Mobile*, the Court's opinion cannot be reconciled persuasively with that case. There are some variances in the largely sociological evidence presented in the two cases. But *Mobile* held that this *kind* of evidence was not enough. Such evidence, we found in *Mobile*, did not merely fall short, but "fell *far* short[,] of showing that [an at-large electoral scheme was] 'conceived or operated [as a] purposeful devic[e] to further racial . . . discrimination.'" *Id.*, at 70 (emphasis added), quoting *Whitcomb* v. *Chavis*, 403 U. S. 124, 149 (1971). Because I believe that *Mobile* controls this case, I dissent.

## II

The Court's decision today relies heavily on the capacity of the federal district courts—essentially free from any standards propounded by this Court—to determine whether at-large voting systems are "being maintained for the invidious purpose of diluting the voting strength of the black population." *Ante*, at 622. Federal courts thus are invited to engage in deeply subjective inquiries into the motivations of local officials in structuring local governments. Inquiries of this kind not only can be "unseemly," see Karst, The Costs of Motive-Centered Inquiry, 15 San Diego L. Rev. 1163, 1164 (1978); they intrude the federal courts—with only the vaguest constitutional direction—into an area of intensely local and political concern.

Emphasizing these considerations, JUSTICE STEVENS, *post*, at 642–650, argues forcefully that the Court's focus of inquiry is seriously mistaken. I agree with much of what he says. As I do not share his views entirely, however, I write separately.

## A

As I understand it, JUSTICE STEVENS' critique of the Court's approach rests on three principles with which I am in fundamental agreement.

First, it is appropriate to distinguish between "state action that inhibits an individual's right to vote and state action that affects the political strength of various groups." *Mobile* v. *Bolden, supra*, at 83 (STEVENS, J., concurring in judgment); see *post*, at 632, 637–638, n. 16. Under this distinction, this case is fundamentally different from cases involving direct barriers to voting. There is no claim here that blacks may not register freely and vote for whom they choose. This case also differs from one-man, one-vote cases, in which districting practices make a person's vote less weighty in some districts than in others.

Second, I agree with JUSTICE STEVENS that vote dilution cases of this kind are difficult if not impossible to distinguish—especially in their remedial aspect—from other actions to redress gerrymanders. See *post*, at 650–653.

Finally, JUSTICE STEVENS clearly is correct in arguing that the standard used to identify unlawful racial discrimination in this area should be defined in terms that are judicially manageable and reviewable. See *post*, at 633, 642–650. In the absence of compelling reasons of both law and fact, the federal judiciary is unwarranted in undertaking to restructure state political systems. This is inherently a political area, where the identification of a seeming violation does not necessarily suggest an enforceable judicial remedy—or at least none short of a system of quotas or group representation. Any such system, of course, would be antithetical to the principles of our democracy.

## B

JUSTICE STEVENS would accommodate these principles by holding that subjective intent is irrelevant to the establishment of a case of racial vote dilution under the Fourteenth Amendment. See *post*, at 637. Despite sharing the concerns

from which his position is developed, I would not accept this view. "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington* v. *Davis,* 426 U. S. 229, 239 (1976). Because I am unwilling to abandon this central principle in cases of this kind, I cannot join JUSTICE STEVENS' opinion.

Nonetheless, I do agree with him that what he calls "objective" factors should be the focus of inquiry in vote-dilution cases. Unlike the considerations on which the lower courts relied in this case and in *Mobile,* the factors identified by JUSTICE STEVENS as "objective" in fact are direct, reliable, and unambiguous indices of discriminatory *intent.* If we held, as I think we should, that the district courts must place primary reliance on these factors to establish discriminatory intent, we would prevent federal-court inquiries into the *subjective* thought processes of local officials—at least until enough objective evidence had been presented to warrant discovery into subjective motivations in this complex, politically charged area. By prescribing such a rule we would hold federal courts to a standard that was judicially manageable. And we would remain faithful to the central protective purpose of the Equal Protection Clause.

In the absence of proof of discrimination by reliance on the kind of objective factors identified by JUSTICE STEVENS, I would hold that the factors cited by the Court of Appeals are too attenuated as a matter of law to support an inference of discriminatory intent. I would reverse its judgment on that basis.

JUSTICE STEVENS, dissenting.

Our legacy of racial discrimination has left its scars on Burke County, Georgia.[1] The record in this case amply sup-

---

[1] Certain vestiges of discrimination—although clearly not the most pressing problems facing black citizens today—are a haunting reminder of an all too recent period of our Nation's history. The District Court found

ports the conclusion that the governing officials of Burke County have repeatedly denied black citizens rights guaranteed by the Fourteenth and Fifteenth Amendments to the Federal Constitution.  No one could legitimately question the validity of remedial measures, whether legislative or judicial, designed to prohibit discriminatory conduct by public officials and to guarantee that black citizens are effectively afforded the rights to register and to vote.  Public roads may not be paved only in areas in which white citizens live;[2] black citizens may not be denied employment opportunities in county government;[3] segregated schools may not be maintained.[4]

Nor, in my opinion, could there be any doubt about the constitutionality of an amendment to the Voting Rights Act that would require Burke County and other covered jurisdictions to abandon specific kinds of at-large voting schemes that perpetuate the effects of past discrimination.  "As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting."  *South Carolina* v. *Katzenbach*, 383 U. S. 301, 324.  It might indeed be wise policy to accelerate the transition of minority groups to a position of political power commensurate with their voting strength by amending the Act to prohibit the use of multimember districts in all covered jurisdictions.

The Court's decision today, however, is not based on either its own conception of sound policy or any statutory command. The decision rests entirely on the Court's interpretation of the requirements of the Federal Constitution.  Despite my sympathetic appraisal of the Court's laudable goals, I am unable to agree with its approach to the constitutional issue that

---

that a segregated laundromat is operated within a few blocks of the county courthouse; at the courthouse itself, faded paint over restroom doors does not entirely conceal the words "colored" and "white."

[2] See *Dowdell* v. *City of Apopka,* 511 F. Supp. 1375 (MD Fla. 1981).

[3] 42 U. S. C. § 2000e–2.

[4] *Brown* v. *Board of Education,* 347 U. S. 483.

is presented. In my opinion, this case raises questions that encompass more than the immediate plight of disadvantaged black citizens. I believe the Court errs by holding the structure of the local governmental unit unconstitutional without identifying an acceptable, judicially manageable standard for adjudicating cases of this kind.

# I

The Court's entry into the business of electoral reapportionment in 1962 was preceded by a lengthy and scholarly debate over the role the judiciary legitimately could play in what Justice Frankfurter described in *Colegrove* v. *Green*, 328 U. S. 549, as a "political thicket."[5] In that case, decided in 1946, the Court declined to entertain a challenge to single-member congressional districts in Illinois that had been cre-

---

[5] In his much criticized opinion announcing the judgment of the Court, Justice Frankfurter wrote:

"Nothing is clearer than that this controversy concerns matters that bring courts into immediate and active relations with party contests. From the determination of such issues this Court has traditionally held aloof. It is hostile to a democratic system to involve the judiciary in the politics of the people. And it is not less pernicious if such judicial intervention in an essentially political contest be dressed up in the abstract phrases of the law.

.        .        .        .        .

"Courts ought not to enter this political thicket. The remedy for unfairness in districting is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress. The Constitution has many commands that are not enforceable by courts because they clearly fall outside the conditions and purposes that circumscribe judicial action. Thus, 'on Demand of the executive Authority,' Art. IV, § 2, of a State it is the duty of a sister State to deliver up a fugitive from justice. But the fulfilment of this duty cannot be judicially enforced. *Kentucky* v. *Dennison*, 24 How. 66. The duty to see to it that the laws are faithfully executed cannot be brought under legal compulsion, *Mississippi* v. *Johnson*, 4 Wall. 475. Violation of the great guaranty of a republican form of government in States cannot be challenged in the courts. *Pacific Telephone Co.* v. *Oregon*, 223 U. S. 118. The Constitution has left the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights." 328 U. S., at 553–554, 556.

ated in 1901 and had become grossly unequal by reason of the great growth in urban population.[6]   In dissent, Justice Black advocated the use of a statewide, at-large election of representatives; he argued that an at-large election "has an element of virtue that the more convenient method does not have—namely, it does not discriminate against some groups to favor others, it gives all the people an equally effective voice in electing their representatives as is essential under a free government, and it is constitutional." *Id.*, at 574.

In 1962, the Court changed course.   In another challenge to the constitutionality of a 1901 districting statute, it held that the political question doctrine did not foreclose judicial review.   *Baker* v. *Carr*, 369 U. S. 186.   That decision represents one of the great landmarks in the history of this Court's jurisprudence.

Two aspects of the Court's opinion in *Baker* v. *Carr* are of special relevance to the case the Court decides today.   First, the Court's scholarly review of the political question doctrine focused on the dominant importance of satisfactory standards for judicial determination.[7]   Second, the Court's articulation

---

[6] The districts ranged in population from 112,000 to 914,000 persons. *Id.*, at 557.

[7] The Court stated that the "nonjusticiability of a political question is primarily a function of the separation of powers." 369 U. S., at 210.   It emphasized, however, that "the lack of satisfactory criteria for a judicial determination" was a dominant consideration in *Coleman* v. *Miller*, 307 U. S. 433, 454–455; that whether a foreign relations question is justiciable turns, in part, on "its susceptibility to judicial handling"; that in the presence of clearly definable criteria for decision "the political question barrier falls away"; and that "even in private litigation which directly implicates no feature of separation of powers, lack of judicially discoverable standards and the drive for even-handed application may impel reference to the political departments' determination of dates of hostilities' beginning and ending." 369 U. S., at 210, 211, 214.   *Luther* v. *Borden*, 7 How. 1, was distinguished, in part, because that case involved "the lack of criteria by which a court could determine which form of government was republican"; the Court stated that "the only significance that *Luther* could have for our immediate purposes is in its holding that the Guaranty Clause is not a repository of judicially manageable standards which a court could utilize in-

of the relevant constitutional standard made no reference to subjective intent.[8] The host of cases that have arisen in the wake of *Baker* v. *Carr* have shared these two characteristics. They have formulated, refined, and applied a judicially manageable standard that has become known as the one-person, one-vote rule; they have attached no significance to the subjective intent of the decisionmakers who adopted or maintained the official rule under attack.

In reviewing the constitutionality of the structure of a local government, two quite different methods of analysis could be employed. The Court might identify the specific features of the government that raise constitutional concerns and decide whether, singly or in combination, they are valid. This is the approach the Court has used in testing the constitutionality of rules conditioning the right to vote on payment of a poll tax,[9] imposing burdens on independent candidates,[10] denying

---

dependently in order to identify a State's lawful government." 369 U. S., at 222, 223. In concluding that the reapportionment question before it was justiciable, the Court emphasized that it would not be necessary "to enter upon policy determinations for which judicially manageable standards are lacking." *Id.*, at 226.

[8] The Court simply stated:

"Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action." *Ibid.*

[9] *Harper* v. *Virginia Board of Elections*, 383 U. S. 663. The Court concluded that "a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax." *Id.*, at 666. "To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor." *Id.*, at 668. In dissent, Justice Black noted: "It should be pointed out at once that the Court's decision is to no extent based on a finding that the Virginia law as written or as applied is being used as a device or mechanism to deny Negro citizens of Virginia the right to vote on account of their color." *Id.*, at 672.

[10] *Storer* v. *Brown*, 415 U. S. 724. The Court stated that, in determining the constitutionality of eligibility requirements for independent candi-

new residents or members of the Armed Forces the right to vote,[11] prohibiting crossovers in party primaries,[12] requiring political candidates to pay filing fees,[13] and disadvantaging minority parties in Presidential elections.[14] In none of these cases did the validity of the electoral procedure turn on whether the legislators who enacted the rule subjectively intended to discriminate against minority voters. Under the approach employed by the Court in those cases, the objective circumstances that led to a declaration that an election procedure was unconstitutional would invalidate a similar law wherever it might be found.

Alternatively, the Court could employ a subjective approach under which the constitutionality of a challenged procedure depends entirely on federal judges' appraisals of the reasons why particular localities have chosen to govern themselves in a particular way. The Constitution would simply protect a right to have an electoral machinery established and maintained without the influence of impermissible factors. Constitutional challenges to identical procedures in neighboring communities could produce totally different results, for the subjective motivations of the legislators who enacted the procedures—or at least the admissible evidence that might be discovered concerning such motivation—could be quite different.

In deciding the question presented in this case, the Court abruptly rejects the former approach and considers only the latter. It starts from the premise that Burke County's at-

---

dates, the "inevitable question for judgment" is "could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" *Id.*, at 742. See *Mandel* v. *Bradley*, 432 U. S. 173, 177; *id.*, at 181 (STEVENS, J., dissenting). See also *American Party of Texas* v. *White*, 415 U. S. 767, 795.

[11] *Dunn* v. *Blumstein*, 405 U. S. 330; *Carrington* v. *Rash*, 380 U. S. 89.

[12] *Kusper* v. *Pontikes*, 414 U. S. 51.

[13] *Lubin* v. *Panish*, 415 U. S. 709; *Bullock* v. *Carter*, 405 U. S. 134.

[14] *Williams* v. *Rhodes*, 393 U. S. 23.

large method of electing its five county commissioners is, on its face, unobjectionable. The otherwise valid system is unconstitutional, however, because it makes it more difficult for the minority to elect commissioners and because the majority that is now in power has maintained the system for that very reason. Two factors are apparently of critical importance: (1) the intent of the majority to maintain control; and (2) the racial character of the minority.[15]

I am troubled by each aspect of the Court's analysis. In my opinion, the question whether Burke County's at-large system may survive scrutiny under a purely objective analysis is not nearly as easy to answer as the Court implies. Assuming, however, that the system is otherwise valid, I do not believe that the subjective intent of the persons who adopted the system in 1911, or the intent of those who have since declined to change it, can determine its constitutionality. Even if the intent of the political majority were the controlling constitutional consideration, I could not agree that the only political groups that are entitled to protection under the Court's rule are those defined by racial characteristics.

## II

At-large voting systems generally tend to maximize the political power of the majority. See *ante*, at 616.[16] There are,

---

[15] The Court's articulation of the applicable standard in this case is somewhat puzzling. It states that this case is subject to "the standard of proof generally applicable to Equal Protection Clause cases." *Ante*, at 617. But later in the same paragraph, the Court indicates that its special requirement of a showing of discriminatory intent merely applies to equal protection cases "charging racial discrimination." *Ibid.* The Court seems to imply that plaintiffs in equal protection cases charging racial discrimination must surmount a special hurdle in order to prevail. Yet the Court has unequivocally stated that a "racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 272.

[16] In the words of Chancellor Kent, the requirement of districting "was recommended by the wisdom and justice of giving, as far as possible, to the

however, many types of at-large electoral schemes. Three features of Burke County's electoral system are noteworthy, not in my opinion because they shed special light on the subjective intent of certain unidentified people, but rather because they make it especially difficult for a minority candidate to win an election. First, although the qualifications and the duties of the office are identical for all five commissioners, each runs for a separately designated position.[17]

---

local subdivisions of the people of each state, a due influence in the choice of representatives, so as not to leave the aggregate minority of the people in a state, though approaching perhaps to a majority, to be wholly overpowered by the combined action of the numerical majority, without any voice whatever in the national councils." 1 J. Kent, Commentaries on American Law *230–*231, n. (c) (12th ed. 1873). See also Mobile v. Bolden, 446 U. S. 55, 105, n. 3 (MARSHALL, J., dissenting); Whitcomb v. Chavis, 403 U. S. 124, 158–160.

The challenge to multimember or at-large districts is, of course, quite different from the challenge to the value of individual votes considered in Reynolds v. Sims, 377 U. S. 533. An at-large system is entirely consistent with the one-person, one-vote rule developed in that case. As Justice Stewart noted in Mobile, in considering the applicability of Reynolds and the cases that followed it:

"Those cases established that the Equal Protection Clause guarantees the right of each voter to 'have his vote weighted equally with those of all other citizens.' 377 U. S., at 576. The Court recognized that a voter's right to 'have an equally effective voice' in the election of representatives is impaired where representation is not apportioned substantially on a population basis. In such cases, the votes of persons in more populous districts carry less weight than do those of persons in smaller districts. There can be, of course, no claim that the 'one person, one vote' principle has been violated in this case, because the city of Mobile is a unitary electoral district and the Commission elections are conducted at large. It is therefore obvious that nobody's vote has been 'diluted' in the sense in which that word was used in the Reynolds case." 446 U. S., at 77–78 (plurality opinion).

See also id., at 83 (STEVENS, J., concurring in judgment).

[17] This feature distinguishes Burke County's at-large electoral system from the municipal commission form of government popularized by reformers shortly after the turn of the century and known as the Galveston Plan or the Des Moines Plan. See n. 19, infra.

Second, in order to be elected, each commissioner must receive a majority of all votes cast in the primary and in the general election; if the leading candidate receives only a plurality, a runoff election must be held. Third, there are no residency requirements; thus, all candidates could reside in a single, all-white neighborhood.[18]

Even if one assumes that a system of local government in which power is concentrated in the hands of a small group of persons elected from the community at large is an acceptable—or perhaps even a preferred—form of municipal government,[19] it is not immediately apparent that these addi-

---

[18] Other features of certain at-large electoral schemes that make it more difficult for a minority group to elect a favored candidate when bloc voting occurs—prohibitions against cumulative and incomplete voting—are not involved in this case. Prohibitions against cumulative or partial voting are generally inapplicable in electoral schemes involving numbered posts.

[19] "During its evolution as a progressive solution to municipal problems, the commission format was variously known as the Galveston plan, the Texas idea, and the Des Moines plan. Since Galveston invented the basic organization and Des Moines popularized the addition of related reform techniques, the new type of government is probably best described as the Galveston—Des Moines plan. So popular did the new idea become that towns could reap advertising benefits for being in the forefront of municipal innovation if they used the commission plan. Consequently, some cities boasted that they had the system, knowing full well that their charters had little resemblance to Galveston's. But there were certain essentials necessary before a city could claim commission status. Benjamin DeWitt, an early historian of the progressive movement, explained:

" 'In every case, however, no matter how much charters may differ as to minor details, they have certain fundamental features in common. These fundamental features of commission charters are four:

"1. Authority and responsibility are centralized.

"2. The number of men in whom this authority and this responsibility are vested is small.

"3. These few men are elected from the city at large and not by wards or districts.

"4. Each man is at the head of a single department.'

"The most radical departure the new scheme made was the combination of legislative and executive functions in one body. The plan disregarded the federal model of separation of powers. Sitting together, the commis-

640

tional features that help to perpetuate the power of an entrenched majority are either desirable or legitimate.[20]  If the only purpose these features serve—particularly when viewed in combination—is to assist a dominant party to maintain its political power, they are no more legitimate than the Tennessee districts described in *Baker* v. *Carr* as *"no* policy, but simply arbitrary and capricious action." 369 U. S., at 226 (emphasis in original). Unless these features are independently justified, they may be invalid simply because there is no legitimate justification for their impact on minority participation in elections.[21]

In this case, appellees have not argued—presumably because they assumed that this Court's many references to the requirement of proving an improper motive in equal protection cases are controlling in this new context—that the special features of Burke County's at-large system have such an

---

sion was a typical policy- and ordinance-making council; but, separately, each commissioner administered a specific department on a day-to-day basis. The original Galveston charter provided for a mayor-president plus commissioners of finance and revenue, waterworks and sewerage, streets and public property, and fire and police. Later commission cities followed a similar division of responsibility." B. Rice, Progressive Cities: The Commission Government Movement in America, 1901–1920, pp. xiii–xiv (1977) (footnote omitted).

[20] It is noteworthy that these features apparently characterize many governmental units in jurisdictions that have been subjected to the strictures of the Voting Rights Act as the result of prior practices that excluded black citizens from the electoral process. See generally The Voting Rights Act: Unfulfilled Goals, A Report of the United States Commission on Civil Rights 38–50 (1981).

[21] No group has a right to proportional representation. See *Mobile* v. *Bolden*, 446 U. S., at 75–76 (plurality opinion); *id.*, at 122 (MARSHALL, J., dissenting). But in a representative democracy, meaningful participation by minority groups in the electoral process is essential to ensure that representative bodies are responsive to the entire electorate. For this reason, a challenged electoral procedure may not be justified solely on the ground that it serves to reduce the ability of a minority group to participate effectively in the electoral process.

adverse impact on the minority's opportunity to participate in the political process that this type of government deprives the minority of equal protection of the law. Nor have the appellants sought to identify legitimate local policies that might justify the use of such rules. As a result, this record does not provide an adequate basis for determining the validity of Burke County's governmental structure on the basis of traditional objective standards.[22]

If the governmental structure were itself found to lack a legitimate justification, inquiry into subjective intent would clearly be unnecessary. As JUSTICE MARSHALL stated in his dissent in *Mobile:* "Whatever may be the merits of applying motivational analysis to the allocation of constitutionally gratuitous benefits, that approach is completely misplaced where, as here, it is applied to the distribution of a constitutionally protected interest." 446 U. S., at 121.[23] Under the

---

[22] The record nevertheless does indicate that the validity of the at-large system itself need not be decided in this case. For it is apparent that elimination of the majority runoff requirement and the numbered posts would enable a well-organized minority to elect one or two candidates to the County Board. That consequence could be achieved without replacing the at-large system itself with five single-member districts. In other words, minority access to the political process could be effected by invalidating specific rules that impede that access and without changing the basic structure of the local governmental unit. See *Mobile* v. *Bolden, supra,* at 80 (BLACKMUN, J., concurring in result).

[23] It is worth repeating the statement of Professor Ely noted by JUSTICE MARSHALL:

"The danger I see is the somewhat different one that the Court, in its newfound enthusiasm for motivation analysis, will seek to export it to fields where it has no business. It therefore cannot be emphasized too strongly that analysis of motivation is appropriate only to claims of improper discrimination in the distribution of goods that are constitutionally gratuitous (that is, benefits to which people are not entitled as a matter of substantive constitutional right). In such cases the covert employment of a principle of selection that could not constitutionally be employed overtly is equally unconstitutional. However, *where what is denied is something to which*

Court's analysis, however, the characteristics of the particular form of government under attack are virtually irrelevant. Not only would the Court's approach uphold an arbitrary—but not invidious—system that lacked independent justification, it would invalidate—if a discriminatory intent were proved—a local rule that would be perfectly acceptable absent a showing of invidious intent. The Court's standard applies not only to Burke County and to multimember districts, but to any other form of government as well.

## III

Ever since I joined the Court, I have been concerned about the Court's emphasis on subjective intent as a criterion for constitutional adjudication.[24] Although that criterion is often

---

*the complainant has a substantive constitutional right*—either because it is granted by the terms of the Constitution, or because it is essential to the effective functioning of a democratic government—*the reasons it was denied are irrelevant.* It may become important in court what justifications counsel for the state can *articulate* in support of its denial or non-provision, but the reasons that actually inspired the denial never can: To have a right to something is to have a claim on it irrespective of why it is denied. It would be a tragedy of the first order were the Court to expand its burgeoning awareness of the relevance of motivation into the thoroughly mistaken notion that a denial of a constitutional right does not count as such unless it was intentional." Ely, The Centrality and Limits of Motivation Analysis, 15 San Diego L. Rev. 1155, 1160–1161 (1978) (emphasis in original) (footnotes omitted).

[24] In *Washington* v. *Davis*, 426 U. S. 229, I wrote:

"Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process. A law conscripting clerics should not be invalidated because an atheist voted for it." *Id.*, at 253 (concurring opinion).

regarded as a restraint on the exercise of judicial power, it may in fact provide judges with a tool for exercising power that otherwise would be confined to the legislature.[25] My principal concern with the subjective-intent standard, however, is unrelated to the quantum of power it confers upon the judiciary. It is based on the quality of that power. For in the long run constitutional adjudication that is premised on a case-by-case appraisal of the subjective intent of local decisionmakers cannot possibly satisfy the requirement of impartial administration of the law that is embodied in the Equal Protection Clause of the Fourteenth Amendment.

The facts of this case illustrate the ephemeral character of a constitutional standard that focuses on subjective intent. When the suit was filed in 1976, approximately 58 percent of the population of Burke County was black and approximately 42 percent was white. Because black citizens had been denied access to the political process—through means that have since been outlawed by the Voting Rights Act of 1965—and because there had been insufficient time to enable the registration of black voters to overcome the history of past injustice, the majority of registered voters in the county were white. The at-large electoral system therefore served, as a result of the presence of bloc voting, to maintain white control of the local government. Whether it would have continued to do so would have depended on a mix of at least three different factors—the continuing increase in voter registration among blacks, the continuing exodus of black residents from the county, and the extent to which racial bloc voting continued to dominate local politics.

If those elected officials in control of the political machinery had formed the judgment that these factors created a likelihood that a bloc of black voters was about to achieve sufficient strength to elect an entirely new administration, they

---

[25] See Miller, If "The Devil Himself Knows Not the Mind of Man," How Possibly Can Judges Know the Motivation of Legislators?, 15 San Diego L. Rev. 1167, 1170 (1978).

might have decided to abandon the at-large system and substitute five single-member districts with the boundary lines drawn to provide a white majority in three districts and a black majority in only two. Under the Court's intent standard, such a change presumably would violate the Fourteenth Amendment. It is ironic that the remedy ordered by the District Court fits that pattern precisely.[26]

If votes continue to be cast on a racial basis, the judicial remedy virtually guarantees that whites will continue to control a majority of seats on the County Board. It is at least possible that white control of the political machinery has been frozen by judicial decree at a time when increased black voter registration might have led to a complete change of administration. Since the federal judge's intent was unquestionably benign rather than invidious—and, unlike that of state officials, is presumably not subject in any event to the Court's standard—that result has been accomplished without violating the Federal Constitution.

In the future, it is not inconceivable that the white officials who are likely to remain in power under the District Court's plan will desire to perpetuate that system and to continue to control a majority of seats on the County Board. Under this Court's standard, if some of those officials harbor such an intent for an "invidious" reason, the District Court's plan will itself become unconstitutional. It is not clear whether the invidious intent would have to be shared by all three white

---

[26] The following table shows a breakdown of the population of the districts in the plan selected by the District Court as to race and voting age:

| District | Voting Age Population | Black Voting Age Population (%) | | White Voting Age Population (%) | |
|---|---|---|---|---|---|
| 1 | 2,048 | 1,482 | (72.4) | 556 | (27.6) |
| 2 | 2,029 | 1,407 | (69.3) | 622 | (30.7) |
| 3 | 2,115 | 978 | (46.2) | 1,137 | (53.8) |
| 4 | 2,112 | 947 | (44.6) | 1,175 | (55.4) |
| 5 | 2,217 | 803 | (36.2) | 1,414 | (63.8) |

See *Lodge* v. *Buxton*, 639 F. 2d 1358, 1361, n. 4 (CA5 1981).

commissioners, by merely a majority of two, or by simply one if he were influential. It is not clear whether the issue would be affected by the intent of the two black commissioners, who might fear that a return to an at-large system would undermine the certainty of two black seats.[27]  Of course, if the subjective intent of these officials were such as to mandate a change to a governmental structure that would permit black voters to elect an all-black commission—and if black voters did so—those black officials could not harbor an intent to maintain the system to keep whites from returning to power. In sum, as long as racial consciousness exists in Burke County, its governmental structure is subject to attack. Perhaps those more familiar than I with political maneuvering will be able to identify with greater accuracy and reliability those subjective intentions that are legitimate and those that are not.  Because judges may not possess such expertise, however, I am afraid the Court is planting seeds that may produce an unexpected harvest.

The costs and the doubts associated with litigating questions of motive, which are often significant in routine trials, will be especially so in cases involving the "motives" of legislative bodies.[28]  Often there will be no evidence that the gov-

---

[27] In *Wright* v. *Rockefeller*, 376 U. S. 52, a group of minority voters in New York City challenged a districting scheme that placed most minority voters in one of four districts.  They sought "a more even distribution of minority groups among the four congressional districts."  *Id.*, at 58.  Congressman Adam Clayton Powell intervened in the lawsuit and argued strenuously "that the kind of districts for which appellants contended would be undesirable and, because based on race or place of origin, would themselves be unconstitutional."  *Ibid.*

[28] Professor Karst has strongly criticized motivational analysis on the ground that it is inadequate to protect black citizens from unconstitutional conduct:

"[E]ven though the proof will center on the effects of what officials have done, the ultimate issue will be posed in terms of the goodness or the evil of the officials' hearts.  Courts have long regarded such inquiries as unseemly, as the legislative investigation cases of the 1950's attest.  The

ernmental system was *adopted* for a discriminatory reason.[29] The reform movement in municipal government, see n. 19, *supra*, or an attempt to comply with the strictures of *Reynolds* v. *Sims*, 377 U. S. 533, may account for the enactment of

principal concern here is not that tender judicial sensitivities may be bruised, but that a judge's reluctance to challenge the purity of other officials' motives may cause her to fail to recognize valid claims of racial discrimination even when the motives for governmental action are highly suspect. Because an individual's behavior results from the interaction of a multitude of motives, and because racial attitudes often operate at the margin of consciousness, in any given case there almost certainly will be an opportunity for a governmental official to argue that his action was prompted by racially neutral considerations. When that argument is made, should we not expect the judge to give the official the benefit of the moral doubt? When the governmental action is the product of a group decision, will not that tendency toward generosity be heightened?" Karst, The Costs of Motive-Centered Inquiry, 15 San Diego L. Rev. 1163, 1164–1165 (1978) (footnote omitted).

To reject an examination into subjective intent is not to rule that the *reasons* for legislative action are irrelevant. "In my opinion, customary indicia of legislative intent provide an adequate basis for ascertaining the purpose that a law is intended to achieve. The formal proceedings of the legislature and its committees, the effect of the measure as evidenced by its text, the historical setting in which it was enacted, and the public acts and deeds of its sponsors and opponents, provide appropriate evidence of legislative purpose." *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 856 (CA7 1972) (Stevens, J., dissenting), cert. denied, 409 U. S. 893. If a challenged law disadvantages minority citizens and its justifications—as evidenced by customary indicia of legislative intent—are insufficient to persuade a neutral observer that the law was enacted for legitimate, nondiscriminatory reasons, it is, in my opinion, invalid.

[29] As the Court of Appeals noted: "The general election laws in many jurisdictions were originally adopted at a time when Blacks had not receive[d] their franchise. No one disputes that such laws were not adopted to achieve an end, the exclusion of Black voting, that was the status quo. Other states' election laws, though adopted shortly after the enactment of the Fifteenth Amendment, are so old that whatever evidence of discriminatory intent may have existed, has long since disappeared. This case falls within that category. The focus then becomes the existence of a discriminatory purpose for the *maintenance* of such a system." 639 F. 2d, at 1363, n. 7.

countless at-large systems. In such a case the question becomes whether the system was *maintained* for a discriminatory purpose. Whose intentions control? Obviously not the voters, although they may be most responsible for the attitudes and actions of local government.[30] Assuming that it is the intentions of the "state actors" that is critical, how will their mental processes be discovered? Must a specific proposal for change be defeated? What if different motives are held by different legislators or, indeed, by a single official? Is a selfish desire to stay in office sufficient to justify a failure to change a governmental system?

The Court avoids these problems by failing to answer the very question that its standard asks. Presumably, according to the Court's analysis, the Burke County governmental structure is unconstitutional because it was maintained at some point for an invidious purpose. Yet the Court scarcely identifies the manner in which changes to a county governmental structure are made. There is no reference to any unsuccessful attempt to replace the at-large system with single-member districts. It is incongruous that subjective intent is identified as the constitutional standard and yet the persons who allegedly harbored an improper intent are never identified or mentioned. Undoubtedly, the evidence relied on by the Court proves that racial prejudice has played an important role in the history of Burke County and has motivated many wrongful acts by various community leaders. But unless that evidence is sufficient to prove that *every* governmental action was motivated by a racial animus—and may be remedied by a federal court—the Court has failed under its own test to demonstrate that the governmental structure of Burke County was maintained for a discriminatory purpose.

Certainly governmental action should not be influenced by irrelevant considerations. I am not convinced, however,

---

[30] Apart from the lack of "state action," the very purpose of the secret ballot is to protect the individual's right to cast a vote without explaining to anyone for whom, or for what reason, the vote is cast.

that the Constitution affords a right—and this is the *only* right the Court finds applicable in this case—to have every official decision made without the influence of considerations that are in some way "discriminatory." Is the failure of a state legislature to ratify the Equal Rights Amendment invalid if a federal judge concludes that a majority of the legislators harbored stereotypical views of the proper role of women in society? Is the establishment of a memorial for Jews slaughtered in World War II unconstitutional if civic leaders believe that their cause is more meritorious than that of victimized Palestinian refugees? Is the failure to adopt a state holiday for Martin Luther King, Jr., invalid if it is proved that state legislators believed that he does not deserve to be commemorated? Is the refusal to provide Medicaid funding for abortions unconstitutional if officials intend to discriminate against women who would abort a fetus?[31]

A rule that would invalidate all governmental action motivated by racial, ethnic, or political considerations is too broad. Moreover, in my opinion the Court is incorrect in assuming that the intent of elected officials is invidious when they are motivated by a desire to retain control of the local political machinery. For such an intent is surely characteris-

---

[31] A stereotypical reaction to particular characteristics of a disfavored group cannot justify discriminatory legislation. See, *e. g., Mathews* v. *Lucas,* 427 U. S. 495, 520–521 (STEVENS, J., dissenting). It is nevertheless important to remember that the First Amendment protects an individual's right to entertain unsound and unpopular beliefs—including stereotypical beliefs about classes of persons—and to expound those beliefs publicly. There is a vast difference between rejecting an irrational belief as a justification for discriminatory legislation and concluding that neutral legislation is invalid because it was motivated by an irrational belief. Fresh air and open discussion are better cures for vicious prejudice than are secrecy and dissembling. No matter how firmly I might disagree with a legislator's motivation in casting a biased vote, I not only must respect his right to form his own opinions, cf. *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 63 (opinion of STEVENS, J.), but also would prefer a candid explanation of those opinions to a litigation-oriented silence.

tic of politicians throughout the country. In implementing that sort of purpose, dominant majorities have used a wide variety of techniques to limit the political strength of aggressive minorities. In this case the minority is defined by racial characteristics, but minority groups seeking an effective political voice can, of course, be identified in many other ways. The Hasidic Jews in Kings County, N. Y.,[32] the Puerto Ricans in Chicago,[33] the Spanish-speaking citizens in Dallas,[34] the Bohemians in Cedar Rapids,[35] the Federalists in Massachusetts,[36] the Democrats in Indiana,[37] and the Republicans in California[38] have all been disadvantaged by deliberate political maneuvers by the dominant majority. As I have stated, a device that serves no purpose other than to exclude minority groups from effective political participation is unlawful under objective standards. But if a political majority's intent to maintain control of a legitimate local government is sufficient to invalidate any electoral device that makes it more difficult for a minority group to elect candidates—regardless of the nature of the interest that gives the minority group cohesion—the Court is not just entering a "political thicket"; it is entering a vast wonderland of judicial review of political activity.

The obvious response to this suggestion is that this case involves a racial group and that governmental decisions that disadvantage such a group must be subject to special scrutiny under the Fourteenth Amendment. I therefore must

---

[32] See *United Jewish Organization* v. *Carey*, 430 U. S. 144.

[33] See *Cousins* v. *City Council of Chicago*, 466 F. 2d 830 (CA7 1972), cert. denied, 409 U. S. 893.

[34] See *White* v. *Regester*, 412 U. S. 755.

[35] See Rice, *supra* n. 19, at 78.

[36] The term "gerrymander" arose from an election district—that took the shape of a salamander—formed in Massachusetts by Governor Elbridge Gerry's Jeffersonian or Democratic-Republican Party. The phrase was coined by Gerry's opponents, the Federalists.

[37] See 39 Congressional Quarterly 758 (1981).

[38] See *id.*, at 941.

consider whether the Court's holding can legitimately be confined to political groups that are identified by racial characteristics.

## IV

Governmental action that discriminates between individuals on the basis of their race is, at the very least, presumptively irrational.[39]   For an individual's race is virtually always irrelevant to his right to enjoy the benefits and to share the responsibilities of citizenship in a democratic society. Persons of different races, like persons of different religious faiths and different political beliefs, are equal in the eyes of the law.

Groups of every character may associate together to achieve legitimate common goals.   If they voluntarily identify themselves by a common interest in a specific issue, by a common ethnic heritage, by a common religious belief, or by their race, that characteristic assumes significance as the bond that gives the group cohesion and political strength. When referring to different kinds of political groups, this Court has consistently indicated that, to borrow JUSTICE BRENNAN's phrasing, the Equal Protection Clause does not make some groups of citizens more equal than others.   See *Zobel* v. *Williams*, 457 U. S. 55, 71 (BRENNAN, J., concurring).   Thus, the Court has considered challenges to discrimination based on "differences of color, race, nativity, religious opinions [or] political affiliations," *American Sugar Refining Co.* v. *Louisiana*, 179 U. S. 89, 92; to redistricting plans that serve "to further racial or economic discrimination," *Whitcomb* v. *Chavis*, 403 U. S. 124, 149; to biases "tending to favor particular political interests or geographic areas." *Abate* v. *Mundt*, 403 U. S. 182, 187.   Indeed, in its

---

[39] Since I do not understand the Court's opinion to rely on an affirmative-action rationale, I put that entire subject to one side.   If that were the rationale for the Court's holding, however, there would be no need to inquire into subjective intent.

opinion today the Court recognizes that the practical impact of the electoral system at issue applies equally to any "distinct minority, whether it be a racial, ethnic, economic, or political group." *Ante*, at 616.

A constitutional standard that gave special protection to political groups identified by racial characteristics would be inconsistent with the basic tenet of the Equal Protection Clause. Those groups are no more or no less able to pursue their interests in the political arena than are groups defined by other characteristics. Nor can it be said that racial alliances are so unrelated to political action that any electoral decision that is influenced by racial consciousness—as opposed to other forms of political consciousness—is inherently irrational. For it is the very political power of a racial or ethnic group that creates a danger that an entrenched majority will take action contrary to the group's political interests. "The mere fact that a number of citizens share a common ethnic, racial, or religious background does not create the need for protection against gerrymandering. It is only when their common interests are strong enough to be manifested in political action that the need arises. Thus the characteristic of the group which creates the need for protection is its political character." *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 852 (CA7 1972) (Stevens, J., dissenting), cert. denied, 409 U. S. 893. It would be unrealistic to distinguish racial groups from other political groups on the ground that race is an irrelevant factor in the political process.

Racial consciousness and racial association are not desirable features of our political system. We all look forward to the day when race *is* an irrelevant factor in the political process. In my opinion, however, that goal will best be achieved by eliminating the vestiges of discrimination that motivate disadvantaged racial and ethnic groups to vote as identifiable units. Whenever identifiable groups in our society are disadvantaged, they will share common political interests and tend to vote as a "bloc." In this respect, racial groups are

like other political groups. A permanent constitutional rule that treated them differently would, in my opinion, itself tend to perpetuate race as a feature distinct from all others; a trait that makes persons different in the eyes of the law. Such a rule would delay—rather than advance—the goal advocated by Justice Douglas:

> "When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal, it should find no footing here." *Wright* v. *Rockefeller*, 376 U. S. 52, 67 (dissenting opinion).

My conviction that all minority groups are equally entitled to constitutional protection against the misuse of the majority's political power does not mean that I would abandon judicial review of such action. As I have written before, a gerrymander as grotesque as the boundaries condemned in *Gomillion* v. *Lightfoot*, 364 U. S. 339, is intolerable whether it fences out black voters, Republican voters, or Irish-Catholic voters. *Mobile* v. *Bolden*, 446 U. S., at 86 (opinion concurring in judgment). But if the standard the Court applies today extends to all types of minority groups, it is either so broad that virtually every political device is vulnerable or it is so undefined that federal judges can pick and choose almost at will among those that will be upheld and those that will be condemned.

There are valid reasons for concluding that certain minority groups—such as the black voters in Burke County, Georgia—should be given special protection from political oppression by the dominant majority. But those are reasons that justify the application of a legislative policy choice rather than a constitutional principle that cannot be confined to spe-

cial circumstances or to a temporary period in our history. Any suggestion that political groups in which black leadership predominates are in need of a permanent constitutional shield against the tactics of their political opponents underestimates the resourcefulness, the wisdom, and the demonstrated capacity of such leaders. I cannot accept the Court's constitutional holding.[40]

I respectfully dissent.

---

[40] The Court does not address the statutory question whether the at-large system violates § 2 of the Voting Rights Act of 1965. Neither the District Court nor the Court of Appeals considered this issue. Since appellees have been granted full relief by the Court, I express no opinion on their statutory claims.