**Leopoldo SIERRA, Antonio Moreno, Cesar Caballero, Fermin Dorado, Patricia Roybal Sutton and Paul Moreno, Plaintiffs,**

v.

**The EL PASO INDEPENDENT SCHOOL DISTRICT and Ronald K. McLeod, Individually and in His Official Capacity as General Superintendent of the El Paso Independent School District and Harold Wiggs, Paul H. Carlton, Mrs. Frankie R. Tanzy, Mrs. William D. Tippin, Mrs. Richard Thurman, Arturo Aguirre and Judith Ridley, Individually and in Their Official Capacities as Members of the Board of Trustees of the El Paso Independent School District, Defendants.**

No. EP–83–CA–203.

United States District Court,
W.D. Texas,
El Paso Division.

April 3, 1984.

Raul Noriega, Texas Rural Legal Aid, Inc., San Antonio, Tex., J.B. Ochoa, Cathy Barnes, El Paso Legal Assistance, El Paso, Tex., for plaintiffs.

Sam Sparks, Grambling & Mounce, H. Keith Myers, El Paso, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

HUDSPETH, District Judge.

This is an action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and the Voting Rights Act of 1965 as amended, 42 U.S.C. § 1973. The Plaintiffs represent a class of all Mexican-American voters within the El Paso Independent School District. Their suit contends that the present system for electing members of the Board of Trustees for the El Paso Independent School District violates the Fourteenth and Fifteenth Amendments to the Constitution of the United States and the Voting Rights Act in that the members of the class they represent have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice to the position of school board trustee. According to the Plaintiffs, this denial of equal opportunity arises from the fact that school board trustees are elected in an at-large, by-place, majority runoff election, rather than by election from single-member districts. On October 25, 1983, the Court certified this proceeding as a class action pursuant to Rule 23, Federal Rules of Civil Procedure, with the class described as all

Mexican-American voters residing in the El Paso Independent School District and all Mexican-Americans who in the future will become eligible to vote in elections for members of the Board of Trustees of the El Paso Independent School District. A trial on the merits was held from March 12 through March 16, 1984. The Court's findings of fact and conclusions of law are incorporated in this opinion.

The El Paso Independent School District is the fifth largest independent school district in the State of Texas. It operates 70 elementary and secondary schools, and serves approximately 60,000 students. It is located entirely within the boundaries of El Paso County, Texas, and covers more than 200 square miles.[1] The school district is governed by a board of seven elected trustees. At least since 1911, all trustees have been elected at large from the district as a whole in nonpartisan elections. Prior to 1940, candidates ran for staggered two-year terms, and elections were held annually. In 1940, the term was increased to six years, still staggered, and elections are held every two years. All candidates ran at large and not by place until 1960, when the board, pursuant to enabling legislation enacted by the Texas legislature, provided for the election of members to the board by numbered positions. Election of candidates was still by straight plurality, however, without any provision for a majority run-off. In 1971, the legislature amended Section 23.11 of the Texas Education Code to permit school districts to adopt a runoff election procedure if no candidate receives a majority of the votes cast for a particular position. On November 16, 1971, the Board of Trustees of the El Paso Independent School District adopted the majority runoff procedure for all trustee elections beginning with those scheduled for 1972. Since 1972, therefore, all trustees have been chosen in at-large, by-place, majority runoff, nonpartisan elections.

It is not disputed that more than 50 percent of those who reside within the El Paso Independent School District are Mexican-American, and that 70 percent of the students enrolled in the schools of the district are Mexican-American. However, Mexican-Americans constitute only 43 percent of the registered voters within the school district. The Plaintiffs contend that the at-large, by-place, majority runoff system for electing school board trustees impermissibly dilutes the voting strength of Mexican-Americans, and makes it difficult for them to elect representatives of their choice to the school board. Therefore, Plaintiffs contend that the present election system violates both the Constitution and the Voting Rights Act.

 It is now well settled that discriminatory purpose must be shown to support a finding of unconstitutional vote dilution under either the Fourteenth or Fifteenth Amendment to the Constitution of the United States. *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). In the instant case, there is no evidence that the board of trustees adopted any feature of the present election system for the purpose of discriminating against any minority or ethnic group. With respect to those aspects of the system in effect before 1971, the Plaintiffs simply offered no evidence at all concerning the purpose or purposes of the school board members who participated in designing the scheme for electing trustees. For example, on January 19, 1960, the board of trustees passed the resolution calling for the election of members to the school board by numbered positions. However, the only evidence offered by the Plaintiffs concerning the adoption of this new procedure was the minutes of the board meeting itself (Plaintiffs' Exhibit 143). The minutes do not reflect any debate or discussion which would shed light upon the purpose of the board in adopting

---

**1.** One other large independent school district (the Ysleta Independent School District, seventh largest in Texas) and several smaller school districts also lie within the borders of El Paso County.

the by-place procedure. No other evidence, direct or circumstantial, was offered by the Plaintiffs which would tend to prove the state of mind or intent of the board members of that era. With respect to the 1971 board resolution adopting the majority runoff procedure, the trial testimony of past board members negates discriminatory intent. For example, Javier Montes, a Mexican-American board member, stated that he supported the resolution because of his belief that a newly-enacted state law mandated runoff elections.[2] Another Mexican-American board member, Elman Chapa, testified that he supported majority runoffs because of his concern about low voter turnout in school board elections, and his belief that a runoff might develop more interest.[3] The minutes of the board meeting at which the runoff election procedure was adopted (Plaintiffs' Exhibit 144) failed to reflect any discussion or debate which would indicate that the majority runoff was intended to dilute minority voting strength. In short, the Plaintiffs have failed to sustain their burden of proving discriminatory intent in connection with the adoption of any feature of the present scheme for electing school board members.

Recognizing that they lack proof of discriminatory purpose in connection with the adoption of these election procedures, the Plaintiffs contend that the board's failure to change the procedures since 1971 despite complaints from minority groups is evidence of an intent to discriminate. The Court finds that the evidence in this regard is, if anything, to the contrary. On October 22, 1976, the board adopted a resolution calling for a referendum on the question whether trustees should be elected at large or by single-member districts (Plaintiffs' Exhibit 145). The referendum was held in 1977, and 53 percent of those voting ap-

proved the idea of single-member districts. On May 10, 1977, the board's attorneys and the school administration were directed to develop a plan for the implementation of single-member districts (Plaintiffs' Exhibit 148). The catch was that the Texas Education Code at that time required the election of school board members from the district at large.[4] Section 23.024 of the Texas Education Code, which authorizes the El Paso Independent School District to elect trustees by single-member districts did not become effective until August 29, 1983. By that time, Plaintiffs had already instituted this suit.[5] In short, the record fails to substantiate the Plaintiffs' claim that the school board's inaction since 1971 is indicative of discriminatory intent. The Court must find in favor of the Defendants with respect to the Plaintiffs' constitutional claims, and then turn to the claims asserted under the Voting Rights Act.

In an amended answer submitted just before trial, and in the agreed pretrial order, the Defendants contend that the 1982 amendment to Section 2 of the Voting Rights Act is unconstitutional. The Court also permitted the Texas Association of School Boards to file an amicus curiae brief in which the constitutionality of the 1982 amendment is questioned. In light of these challenges to the constitutionality of the Act, notice was given to the Attorney General of the United States pursuant to 28 U.S.C. § 2403(a) and the Attorney General has filed a brief in support of the constitutionality of the 1982 amendment. Fortunately, this issue is greatly simplified by the decision of the United States Court of Appeals in *Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir.1984), in which the constitutionality of the 1982 amendment to Section 2 of the Voting Rights Act is specifi-

2. Mr. Montes was elected to the board of trustees in 1970 in a straight plurality election, and was reelected in 1976 under the majority runoff procedure.

3. Mr. Chapa was elected to the board in 1968 in a straight plurality election and reelected in 1974 under the majority runoff procedure. In 1980, he ran for reelection but lost in a runoff.

4. The Texas legislature had enacted legislation which permitted the election of school trustees from single-member districts only in Dallas and Houston.

5. The Plaintiffs' original complaint was filed June 27, 1983.

cally upheld. Following binding Fifth Circuit precedent, this Court also holds that the 1982 amendment to Section 2 of the Voting Rights Act is constitutional.

■ In amending Section 2 of the Voting Rights Act in 1982, Congress reacted to the decision of the Supreme Court in *City of Mobile v. Bolden, supra,* by substituting a "results test" for the prior requirement that discriminatory purpose be shown. *Velasquez v. City of Abilene, Texas,* 725 F.2d 1017, 1021 (5th Cir.1984); *Jones v. City of Lubbock, supra.* Under the amended Act, electoral practices and procedures that create discriminatory results are prohibited, even though the governmental body in question did not install or maintain the electoral practice or procedure for the purpose of discrimination. *Jones v. City of Lubbock, supra.* As stated in the Senate Report on the 1982 amendment:

> "The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system or practice in order to establish a violation. Plaintiff must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process."

S.Rep. No. 417, 97th Cong., 2d Sess., 1982 U.S.Code Cong. & Ad.News at 177, 205. As amended, Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, reads as follows:

> "(a) No voting qualification or prerequisite to voting, standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title [which applies the Act's protection to members of any language minority], as provided in subsection (b) of this section.
>
> "(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance that may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

As an aid to the interpretation of the amended Act, the legislative history of the 1982 amendment lists certain objective factors which should guide the Courts in determining whether a specific election system has discriminatory results:

> "1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> "2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> "3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> "4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

"5. the extent to which the members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinders their ability to participate effectively in the political process;

"6. whether political campaigns have been characterized by overt or subtle racial appeals;

"7. the extent to which members of the minority group have been elected to public office in the jurisdiction."

S.Rep. No. 417 at 28–29, 1982 U.S.Code Cong. & Ad.News at 206–7; *Jones v. City of Lubbock, supra.* In addition to these seven factors, Congress listed two others which are less significant, but which might have limited relevance in certain situations. They are (1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group, and (2) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, standard, practice or procedure is tenuous. S.Rep. No. 417 at 29, 1982 U.S.Code Cong. & Ad.News at 207; *Jones v. City of Lubbock, supra.* In the instant case, therefore, the Court must proceed to analyze the evidence presented at the trial on the merits in light of these Congressional factors.

The first factor to be considered is whether past official discrimination has affected the right of Mexican-Americans to register, vote, or otherwise to participate in the political process. In this connection, two forms of past discrimination stand out: the poll tax and the English language ballot. It is now well established that, prior to the repeal of the poll tax, the requirement that citizens pay a poll tax as a prerequisite for voting eligibility impacted heavily upon persons in the lower income group, which in terms of El Paso County meant predominantly Mexican-Americans. The effect of the poll tax requirement lingered on even after its repeal, and in part has accounted for the lower level of Mexican-American voter registration. See *Graves v. Barnes,* 378 F.Supp. 640, 656 (W.D.Tex.1974). Furthermore, until recent years, all ballots were printed exclusively in English, and this tended to deter voting by Mexican-American voters who did not understand the English language. See *Graves v. Barnes, supra.* These past discriminatory practices still contribute to some extent to the fact that Mexican-Americans register and vote in lower percentages than eligible Anglo voters.

The next factor to be considered is whether voting in the elections of the school district is racially polarized. The evidence adduced at trial establishes clearly that voting in school district elections tends to be highly polarized along ethnic lines. The Plaintiffs' expert witness, Dr. Robert Brischetto, conducted a study of 15 school board trustee races between 1974 and 1982 in which one or more Mexican-American candidates opposed one or more Anglo candidates. In 11 of those 15 races, Dr. Brischetto concluded that voting polarization was high. Of the remaining four races, polarization was moderate in two and low in two. In an effort to check his findings with respect to the school board races, Dr. Brischetto also analyzed 12 races for El Paso Community College trustees and six races for city councilman positions. He found high voting polarization in eight of the 12 Community College races, and in four of the six city council races. Although not directly in point, these latter findings do tend to substantiate Dr. Brischetto's conclusion that voting in the school board elections, as well as other elections conducted in El Paso County, is highly polarized along ethnic lines. Another political scientist who testified for the Plaintiffs, Dr. Rodolfo De La Garza, had conducted studies of Mexican-American voting patterns in El Paso County, and he concluded that ethnicity was the largest single determining factor in most elections conducted in El Paso.

Even more persuasive to the Court than the testimony of the expert witnesses, however, was the testimony of the practical

politicans [6] who are thoroughly familiar with voting behavior in El Paso County. These witnesses testified unequivocally that bloc voting by Mexican-Americans for Mexican-American candidates and by Anglos for Anglo candidates is a political fact of life in El Paso, and one with which all candidates must deal in plotting their respective campaign strategies.

The Defendants attempted to counter the evidence presented by the Plaintiffs with respect to voting polarization with the testimony of Dr. William Wachtel, a statistician with no prior experience in analyzing election results or studying voting polarization. Dr. Wachtel analyzed the same elections studied by Dr. Brischetto, but used a different methodology in that he tried to detect the presence or absence of polarization by studying the votes cast for each candidate separately, rather than grouping all Anglo candidates and all Mexican-American candidates involved in the same school board race. Dr. Wachtel's methodology is obviously inferior to that used by Dr. Brischetto, and would have a tendency to produce distorted results. It is interesting to note, however, that even Dr. Wachtel's analysis revealed significant voting polarization along ethnic lines.[7]

In summary, the Court finds from the evidence that polarization is a well-known and well-understood phenomenon in all political races in El Paso County, including school board races, and that the ethnicity of a candidate is one of the most important factors in determining voter preference.

The Court must next consider the extent to which the present scheme for electing school board trustees (at large, by place, majority runoff, nonpartisan election) enhances the opportunity for discrimination against Mexican-Americans. There can be little doubt from the evidence that the present at large system places Mexican-Americans at a significant disadvantage in electing candidates to the position of trustee for the El Paso Independent School District. The vast size of the district, and its large population, render it almost impossible for a candidate to rely solely upon a door-to-door or person-to-person campaign. Traditional forms of political advertising (e.g. billboards, mailings, news media advertising) are very expensive, and it is difficult for Mexican-Americans, who generally represent a lower-income group, to raise funds necessary for an adequate district wide campaign. Furthermore, the lack of access to campaign funds is not alleviated in school board races by the presence of a political party or even a slating organization; elections are nonpartisan and there is no slating process in the true meaning of that term. These disadvantages are greatly enhanced by the other features of the school district's electoral system, to wit: staggered terms, filing by numbered positions, and majority runoff. Staggered terms and numbered positions (by place filing) tend to create head-to-head races and to promote majority-minority confrontation. *Rogers v. Lodge, supra,* 458 U.S. at 627, 102 S.Ct. at 3280; *City of Rome v. United States,* 446 U.S. 156, 185 n. 21, 100 S.Ct. 1548, 1566 n. 21, 64 L.Ed.2d 119 (1980); *Jones v. City of Lubbock, supra.* The majority runoff provision has the natural effect of enhancing the underlying tendency toward ethnic polarization, and gives a great advantage to Anglo candidates to the detriment of minority candidates. *Rogers v. Lodge, supra* 458 U.S. at 627, 102 S.Ct. at 3280; *Jones v. City of Lubbock, supra.* Taken in combination, the by-place and majority runoff requirements effectively prevent single shot voting. Furthermore, the absence of any subdistrict residency requirement has contributed to the fact that no person residing in any of the South El Paso precincts that have the heaviest concentration of Mexican-American

---

**6.** These included State Representative Paul Moreno, District Judge Edward Marquez, City Council Member and former County Clerk, Alicia Chacon, and Mrs. Margarita Blanco, a woman who has campaigned for many candidates in various political races over the past 30 years.

**7.** Dr. Wachtel found high polarization in the votes cast for 11 of 33 school board candidates and nine of 21 city council candidates.

residents has ever been elected to the position of trustee of the El Paso Independent School District. When the present at-large by-place majority runoff nonpartisan election scheme is considered in conjunction with the history of official discrimination and the pattern of polarized voting, the conclusion is inescapable that Mexican-Americans have less opportunity than do other members of the electorate to participate in the political process and to elect representatives of their choice to the school board.

The next factor to be considered is whether there is a candidate-slating process in connection with school board elections, and, if so, whether Mexican-Americans have been denied access to the slating process. The Court finds from the evidence that no slating process exists. A good illustration of the kind of "slating process" meant by Congress is found in *Velasquez v. City of Abilene, Texas, supra,* in which the Court of Appeals describes the organization known as Citizens for Better Government. This organization is identified as "a white-Anglo-dominated slating organization which exercises nearly complete control over Abilene's city politics through its endorsement and support of candidates." *Velasquez v. City of Abilene, Texas, supra* at 1019. Nothing even remotely resembling the Citizens for Better Government exists with respect to school board elections in the El Paso Independent School District. In fact, the evidence does not indicate the existence of any slating organization, effective or ineffective, in connection with school board elections.

The Plaintiffs argue that an informal slating process exists in the sense that vacancies which occur on the board of trustees between elections are filled by vote of the remaining incumbent trustees, and the persons so appointed then run for election

as incumbents. Whatever this procedure may be called, however, it stretches the English language beyond its limits to call it a "slating process." By the same token, it is not a slating process for an incumbent trustee to contact his friends and to encourage them to run for vacancies on the school board. Finally, if either of these procedures could be termed a slating process, the evidence is clear that the process is open to Mexican-Americans as well as to Anglos. This fact may be illustrated by two specific examples: (1) Arturo Aguirre testified that he was appointed to fill an unexpired term and ran for election the following year as an incumbent; and (2) Javier Montes testified that he was contacted by Elman Chapa, a friend from the Bowie High School Alumni Association, and encouraged to run for a vacant position in 1970. To make a long story short, the evidence simply does not support the Plaintiffs' half-hearted claim of the existence of a slating process, and, if there is a slating process, it is obviously open to Mexican-Americans.[8]

The Court must next consider the extent to which Mexican-Americans within the El Paso Independent School District bear the effects of discrimination in the areas of education, employment and health, which hinders their ability to participate effectively in the political process. There can be no question that in past years there was discrimination against Mexican-Americans in the areas of employment and education.[9] Past discrimination in these areas is partly responsible for the findings made earlier in this opinion to the effect that Mexican-Americans historically occupy a lower economic status, that many are not proficient in the English language, and that Mexican-Americans tend to register and to vote in lesser numbers than their Anglo counterparts. The trial record is insufficient to

8. In a brief filed after the trial's conclusion, the Plaintiffs attempt to bolster their claim as to the existence of a slating process by quoting from deposition testimony not offered in evidence (Plaintiffs' posttrial brief, pp. 15–17). The proposition that the Court may not consider any

evidence that is outside the record would seem to require no further elaboration.

9. No evidence was presented which would indicate discrimination against Mexican-Americans in the area of health. Plaintiffs apparently make no contentions along those lines.

permit the Court to make findings over and above these generalizations. For example, there is no evidence of any present discrimination against Mexican-Americans in the field of education. On the contrary, the El Paso Independent School District is doing an admirable job, considering its limited financial resources, of furnishing a quality education to all students within the school district, 70 percent of whom are Mexican-American. Furthermore, although there was testimony concerning unusually high rates of unemployment in the areas of South El Paso which have the highest concentration of Mexican-American population, the record fails to show how many of those affected by unemployment are recent immigrants or resident aliens as opposed to citizens. The evidence also fails to show how many residents of South El Paso were educated (or not educated) in Mexico rather than in the United States.

The next factor to be considered is whether political campaigns for the office of trustee have been characterized by overt or subtle racial appeals. Mrs. Maxine Silva, a candidate for trustee in the 1948 school board election, testified that during her campaign she received telephone calls in which she was accused of being a "wetback," and subjected to other ethnic slurs. The Court accepts the testimony of Mrs. Silva, and finds it to be quite credible. It was her further testimony, however, that times have changed, and that the same atmosphere does not exist today. In fact, Mrs. Silva is again a candidate for trustee in the 1984 school board election. The other evidence offered by the Plaintiffs in this regard is much less convincing. For example, one Felipe Peralta, testified that he was a victim of ethnic appeals and slurs as a candidate for trustee in 1970. However, the winning candidate in that school board race was Javier Montes, a Mexican-American, who received approximately 3,500 votes to Peralta's 800. The claim is also made that in the 1972 school board election, two candidates, Jose Pinon, Jr. and Cleofas Calleros, were defeated on the basis of their ethnicity. What the testimony as a whole actually reveals, however, is that the news media and the public identified both candidates with an organization called ME-CHA, a group of militant college students that was in the process of conducting demonstrations on the campus of the University of Texas at El Paso. It must be remembered that 1972 was the year of the Nixon-McGovern landslide, and that being perceived by the public as a "radical" probably would have occasioned the defeat of any candidate in any race in any district in the United States in that particular year. The Court is unable to find in the record any concrete evidence of any "racial appeals" as such in connection with the campaigns of these two candidates. The Court is also persuaded by the testimony of another witness for the Plaintiffs, Judge Edward Marquez, who testified that he had observed every election in El Paso since 1960, and that the only race in his memory that involved ethnic appeals was the election of El Paso Community College Trustees in 1976. That election, of course, had no relation to the El Paso Independent School District.

Finally, the Court must take into consideration the extent to which Mexican-Americans have been elected to office in the El Paso Independent School District. The Defendants offered evidence that, since 1950, seven of the 28 trustees, or 25 percent, have been Mexican-Americans. This statistic is somewhat misleading, in that one of the seven Mexican-Americans, Mr. Emilio Peinado, was appointed to fill a vacancy on the board in 1960, and resigned in 1963 without having run for election. Although the percentage of Mexican-Americans that have been elected to the school board is somewhat less than the percentage of registered voters who are Mexican-American, the difference is not great enough to be significant in and of itself. However, it does have a tendency to verify the earlier finding that Mexican-Americans find it more difficult than Anglos to be elected to the school board.

Two other factors which have limited relevance, but which the Court may consider, are whether there is a lack of responsiveness on the part of school trustees to the

particularized needs of Mexican-Americans, and whether the policy underlying the present at-large election system is tenuous. Taking the second factor first, the Court finds that the policy is certainly tenuous in light of the 1977 referendum vote in favor of single-member districts, which presumably reflects the opinions of the majority of voters within the school district, and the 1983 action of the Texas Legislature in authorizing single-member districts for school districts the size of the El Paso Independent School District. These two facts combined make it difficult to justify the continuation of the at-large election system even on the basis of political theory, quite apart from consideration of minority-voting rights.

With regard to the element of responsiveness, the Plaintiffs make much of a previous decision styled *Alvarado v. El Paso Independent School District*, 426 F.Supp. 575 (W.D.Tex.1976), *affirmed* 593 F.2d 577 (5th Cir.1979), in which the Court found that the El Paso Independent School District had discriminated against Mexican-American students in certain respects. Most of the events involved in that law suit, however, occurred before 1970, and they are not probative of any lack of responsiveness on the part of the present board of trustees. On the contrary, the Court has already found earlier in this opinion that the El Paso Independent School District is presently doing a commendable job of furnishing educational services to Mexican-American students. For example, the El Paso Independent School District was a pioneer in bilingual education, developing a comprehensive program in the early 1970s financed entirely with local funds prior to the enactment of any legislation by the State of Texas. Furthermore, the district has taken affirmative action to recruit qualified Mexican-American teachers for the school system, and has promoted those who have shown leadership ability to supervisory positions such as school principals. Teachers employed by the school district have been encouraged to go back to college and to obtain master's degrees with specialization in the area of counseling minority students. The evidence further shows that achievement test scores recorded by Mexican-American students have improved markedly in the last few years. Since 45 percent of the districts' 60,000 students come from families who are classified as "impoverished," the school district carries out the largest school lunch, breakfast, and milk programs in the State of Texas. Although these programs are funded with federal funds, the school district must administer them for the benefit of the students. Finally, a program of the school district that has particular relevance to this case is the practice of causing high school principals to be deputized as voting registrars, and emphasizing the registration of students who become 18 years of age while attending high school. Since two-thirds of the high school students in the district are Mexican-American, the result will be the registration of more Mexican-American voters. In summary, the Court is unable to find any evidence of a present lack of responsiveness by the school board to the particularized needs of Mexican-Americans.

■ The Voting Rights Act requires that the totality of the circumstances be considered in determining whether a particular system of electing public officials results in the denial to a particular class of citizens of equal opportunity to participate in the political process and to elect representatives of their choice. In the instant case, the present at-large, by-place, majority runoff, nonpartisan election of school board trustees does tend to deprive Mexican-Americans of an equal opportunity to elect candidates of their choice. This finding is based primarily upon the consideration of the first three factors, to wit: (1) historical discrimination of an official nature that affected the exercise by Mexican-Americans of their rights to register and vote; (2) the high degree of voter polarization along ethnic lines in elections conducted by the El Paso Independent School District; and (3) the extent to which the at-large, by-place, majority runoff, nonpartisan election procedure enhances the difficulties

faced by a Mexican-American candidate seeking election to the position of school board trustee. It is not without significance that, at the present time, and for the last four years, a school district, of which 70 percent of the students are Mexican-American, of which over 50 percent of the residents are Mexican-American, and of which 43 percent of the registered voters are Mexican-American, has had only one trustee out of seven who is of Mexican-American descent. Although the other factors listed by Congress must be considered, and although each has been considered in this opinion, the Court's findings with respect to the first three factors in combination inescapably point to a result which violates the Voting Rights Act as amended in 1982. Therefore, judgment must be entered in favor of the Plaintiffs, and the Defendants must be ordered to implement single-member districts in place of the present at-large scheme.

The Plaintiffs have proposed a specific plan for the creation of seven single-member districts within the El Paso Independent School District (Plaintiffs' Exhibit 78). It would not be permissible, however, for the Court to adopt the plan proposed by the Plaintiffs or anyone else without first affording an opportunity to the school district to draft its own plan for reapportionment. It is now well settled that apportionment is primarily a legislative responsibility. *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975); *Jones v. City of Lubbock, supra*. The governmental body in question must be afforded a reasonable opportunity to produce an apportionment plan that is constitutionally permissible. *Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978); *Jones v. City of Lubbock, supra*. In this case, therefore, the El Paso Independent School District and its Board of Trustees will be required to prepare and to submit to the Court as soon as possible an apportionment plan dividing the district into seven single-member districts. The Plaintiffs will be given an opportunity to object to the plan proposed, and, if necessary, a hearing will be held on their objections, if any. All further at-large elections, including the one scheduled for April 7, 1984, must be restrained and enjoined pending the approval by the Court of a constitutionally permissible plan for the election of trustees from single-member districts. A judgment will be entered accordingly.