IN THE UNITED STATES DISTRICT COURT 
 FOR THE DISTRICT OF KANSAS 

MIGUEL COCA and 
ALEJANDRO RANGEL-LOPEZ, 

 Plaintiffs, 
 vs. Case No. 22-1274-EFM 

CITY OF DODGE CITY, a municipal 
corporation, the DODGE CITY 
COMMISSION, E. KENT SMOLL, in his 
official capacity as Mayor of Dodge City, 
MICHAEL BURNS, in his official capacity 
as Vice-Mayor of Dodge City, RICK 
SOWERS, in his official capacity as a 
member of the Dodge City Commission, 
CHUCK TAYLOR, in his official capacity 
as a member of the Dodge City Commission, 
and JOSEPH NUCI, in his official capacity 
as a member of the Dodge City Commission, 

 Defendants. 

 MEMORANDUM AND ORDER 
 Before the Court is Defendants’ Motion to Dismiss (Doc. 37) Plaintiffs Miguel Coca and 
Alejandro Rangel-Lopez’s claims under Section 2 of the Voting Rights Act (“VRA”), the 
Fourteenth Amendment’s Equal Protection Clause, and the Fifteenth Amendment pursuant to 
Federal Rule of Civil Procedure 12(b)(6). Plaintiffs have brought these claims based on Dodge 
City’s at-large voting scheme by which members of its governing body are elected. In Plaintiffs’ 
view, this election system has resulted in Latino voters being unable to elect their preferred 
candidates because it unconstitutionally dilutes the Latino vote. For the reasons state below, the 
Court grants Defendants’ Motion as to Plaintiffs’ Fifteenth Amendment claim while denying it as 
to Plaintiffs’ other claims. 
 I. Factual and Procedural Background1 

 Both Plaintiffs are Latino U.S. citizens of legal voting age who reside in Dodge City (the 
“City”). The Defendants are the City itself and members of the Dodge City Commission: E. Kent 
Smoll, who also serves as the City’s Mayor; Michael Burns, the City’s Vice-Mayor; Rick Sowers; 
Chuck Taylor; and Joseph Nuci. It is this Commission, specifically the voting scheme by which 
members are elected, that forms the basis of Plaintiffs’ claims. 
 The City utilizes a commission-manager form of government as contemplated by K.S.A. § 
12-184b(b)(3). Five members comprise the Commission, each serving either two-year terms or 
four-year terms depending on how many votes they receive. The City’s citizens elect these 
members under an at-large voting system. In other words, the City is not divided into multiple 

districts—rather each member of the Commission receives votes from citizens all over the City. 
 Plaintiffs allege that this election method dilutes the votes of the Latino community in 
Dodge City. Specifically, Plaintiffs allege that no Latino-preferred candidates have been elected 
to the Commission since at least before 2000.2 In 2000, 2006, 2014, 2017, and 2021, Latino 
candidates ran for a spot on the Commission, receiving large numbers of votes in Latino-dominant 

 1 The facts taken from Plaintiffs’ Complaint and are considered true from the purposes of this Order. 
 2 Plaintiffs allege that data regarding Latino-preferred candidates running for seats on the Commission prior 
to 2000 does not exist. 
precincts within Dodge City. However, because these candidates received little or no support in 
the white-dominant precincts, they could not obtain seats on the Commission. 
 Considering how the Latino population has grown significantly in the past twenty years, 
Plaintiffs allege that the inability of Latino-preferred candidates to obtain a single seat on the 
Commission is evidence of vote dilution. In 2000, Latinos comprised 42.3% of the Dodge City’s 
overall population. That number grew to 63.9% by 2020. Similarly, the number of Latino citizens 
of voting age (““CVAP”) increased from 19.53% in 2000 to 46.13% in 2021. 

 = asrss 

 Vi re
 Yi 7 □
 Total Population: =» 
 —_ Hispanic or Latino ~ 
 nd % 60% 95% 
 tea | a 
 : a @ satellite view □
 Plaintiffs included the following demographic heat map in their Complaint, purporting to 
show the population density of Latinos around the Dodge City area. 

 -3- 

 According to Plaintiff’s interpretation of the map, the south and southeastern areas of 
Dodge City are home to a Latino majority, while the north and northwestern areas consist mainly 
of white citizens. Plaintiffs allege that it is possible to draw five distinct districts, one for each 
Commission member, so as to make Latino voters the majority in at least one of those districts. 
This districting would then allow Latino voters to elect candidates of their choice to the 

Commission. However, Plaintiffs do not offer any suggested redistricting map to show where their 
proposed districts would lie. 
 Plaintiffs initiated the present lawsuit on December 15, 2022, asserting claims for violation 
of Section 2 of the VRA, the Fourteenth Amendment’s Equal Protection Clause, and the Fifteenth 
Amendment. Defendants waited less than a month to bring the present Motion to Dismiss. On 
February 10, 2023, the United States filed an amicus brief in this matter, advocating on behalf of 
Plaintiffs’ right to bring a private claim for Defendants’ alleged violation of Section 2 and arguing 
against a higher pleading standard for vote dilution claims. 
 II. Legal Standard 

 Under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the 
plaintiff has failed to state a claim upon which relief can be granted.3 Upon such motion, the court 
must decide “whether the complaint contains ‘enough facts to state a claim to relief that is plausible 
on its face.’ ”4 A claim is facially plausible if the plaintiff pleads facts sufficient for the court to 
reasonably infer that the defendant is liable for the alleged misconduct.5 The plausibility standard 

 3 Fed. R. Civ. P. 12(b)(6). 
 4 Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting Bell Atl. Corp. v. 
Twombly, 550 U.S. 544, 570 (2007)); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). 
 5 Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). 
reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature 
of claims as well the grounds on which each claim rests.6 Under Rule 12(b)(6), the court must 
accept as true all factual allegations in the complaint, but need not afford such a presumption to 
legal conclusions.7 Viewing the complaint in this manner, the court must decide whether the 
plaintiff’s allegations give rise to more than speculative possibilities.8 If the allegations in the 

complaint are “so general that they encompass a wide swath of conduct, much of it innocent, then 
the plaintiffs ‘have not nudged their claims across the line from conceivable to plausible.’ ”9 
 III. Analysis 
 Although Defendants move to dismiss each of Plaintiffs’ claims, they spend most of their 
memorandum in support attacking Plaintiffs’ Section 2 claim. After arguing against the 
availability of a Section 2 and asserting that Plaintiffs’ claim would fail on the merits anyway, 
Defendants contend that Plaintiffs’ constitutional causes of action fail to state a claim. The Court 
will discuss each of Defendants’ arguments in turn below. 
A. Plaintiffs may bring a private claim violation of Section 2 of the VRA. 

 Plaintiffs’ first count is violation of Section 2 of the VRA. Before addressing the merits of 
this claim, Defendants raise a monumental issue sure to find its ultimate conclusion beyond this 
Court—whether private plaintiffs may sue for violation of Section 2 of the VRA. In essence, this 

 6 See Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); see also Fed. R. Civ. 
P. 8(a)(2). 
 7 Iqbal, 556 U.S. at 678–79. 
 8 See id. (“The plausibility standard is not akin to a ‘probability requirement,’ but it asks for more than a 
sheer possibility that a defendant has acted unlawfully.” (citation omitted)). 
 9 Robbins, 519 F.3d at 1247 (quoting Twombly, 550 U.S. at 570). 
issue presents two questions: (1) does Section 2 provide a private right of action and (2) does it 
create private rights such that a private plaintiff could bring a claim under § 1983? 
 1. Does Section 2 create a private right of action? 
 Relying primarily on Justice Gorsuch’s concurrence in Brnovich v. Democratic National 
Committee10 and the district court’s ruling in Arkansas State Conf. NAACP v. Arkansas Board of 

Apportionment,11 Defendants argue that Section 2 fails to provide a private right of action based 
on the express statutory language. Defendants admit that for decades and throughout hundreds of 
cases a private right of action has been assumed. Justice Gorsuch’s concurrence in Brnovich, 
however, upends that distinct line of precedent, labeling Section 2’s private right of action as “an 
open question” in lower courts.12 Taking Justice Gorsuch up on his invitation to address the “open 
question,” the Arkansas State court determined that Section 2 does not provide a private right of 
action.13 In a “thorough and well-reasoned—though admittedly, controversial—order,”14 the court 
determined that neither the text of Section 2 nor precedent required it to recognized a private right 
of action within Section 2.15 

 To summarize, the court relied upon the recent string of Supreme Court cases beginning 
with Alexander v. Sandoval16 where the Supreme Court “made quite clear that judicially implied 

 10 141 S. Ct. 2321 (2021). 
 11 586 F. Supp. 3d 893 (E.D. Ark. 2022). 
 12 Brnovich, 141 S. Ct. at 2350 (J. Gorsuch, concurring). Only Justice Thomas joined in this concurrence. 
 13 Arkansas State, 586 F. Supp. 3d at 915–16. 
 14 Turtle Mountain Band of Chippewa Indians v. Jaeger, 2022 WL 2528256, at *3 (D.N.D. 2022) (referring 
to Arkansas State Conf. NAACP opinion). 
 15 Arkansas State, 586 F. Supp. 3d at 907–16. 
 16 532 U.S. 275 (2001); see also Gonzaga Univ. v. Doe, 536 U.S. 273 (2002); Stoneridge Inv. Partners, LLC 
v. Scientific-Atlanta, 552 U.S. 148 (2008); Ziglar v. Abbasi, 582 U.S. 120 (2017). 
private rights of action are now extremely disfavored.”17 Under the Sandoval test, the statute must: 
(1) contain create a private right and (2) provide for a private remedy before a private party can 
enforce it.18 This test requires an in-depth analysis of the statutory text “to determine whether it 
displays an intent to create . . . a private remedy.”19 
 The Arkansas State court went on to analyze the text and structure of the VRA, naturally 

emphasizing the language of Section 2.20 In its entirety, Section 2 of the VRA states: 
 (a) No voting qualification or prerequisite to voting or standard, practice, or 
 procedure shall be imposed or applied by any State or political subdivision in a 
 manner which results in a denial or abridgement of the right of any citizen of the 
 United States to vote on account of race or color, or in contravention of the 
 guarantees set forth in section 10303(f)(2) of this title, as provided in subsection 
 (b). 

 (b) A violation of subsection (a) is established if, based on the totality of 
 circumstances, it is shown that the political processes leading to nomination or 
 election in the State or political subdivision are not equally open to participation by 
 members of a class of citizens protected by subsection (a) in that its members have 
 less opportunity than other members of the electorate to participate in the political 
 process and to elect representatives of their choice. The extent to which members 
 of a protected class have been elected to office in the State or political subdivision 
 is one circumstance which may be considered: Provided, That nothing in this 
 section establishes a right to have members of a protected class elected in numbers 
 equal to their proportion in the population.21 

 17 Arkansas State, 586 F. Supp. 3d at 906. 
 18 See Sandavol, 532 U.S. at 286–88. 
 19 Id. at 286. 
 20 Arkansas State, 586 F. Supp. 3d at 906. 
 21 52 U.S.C. § 10301 (emphasis in original). 
 As readily admitted by the Supreme Court, “§ 2 . . . provides no right to sue on its face” 
and “lack[s] . . . express authorizing language.”22 In fact, nothing in the entire statute explicitly 
references a private remedy.23 
 Furthermore, Section 12 constitutes the remedial portion of the VRA, offering both civil 
and criminal sanctions—even imprisonment—for violation of Section 2.24 Section 12(d) also 

“affirmatively authorizes the Attorney General of the United States to seek a preliminary or 
permanent injunction to prevent the violation.”25 Likewise, Section 14 allows the “prevailing 
party, other than the United States” to receive attorneys’ fees, expert fees, and costs in “action[s] 
or proceeding[s] to enforce the voting guarantees of the fourteenth or fifteenth amendment.”26 
Notably, Section 14 facially applies only to actions brought to enforce the Fourteenth or Fifteenth 
Amendments—not the VRA itself.27 The court, therefore, found that the text of the VRA did not 
impliedly support finding that Section 2 created a private right of action.28 Relying on the lack of 
language supporting a private right of action and the Supreme Court’s recent trend toward 
disavowing judicially recognized rights of action, the court determined that Section 2 did not create 
a private right of action.29 However, it did not address whether Section 2 creates private rights 

such that it could be enforced under § 1983. 

 22 Morse, 517 U.S. at 232. 
 23 See Arkansas State, 586 F. Supp. 3d at 907. 
 24 Id. at 908 (citing 52 U.S.C. § 10308(d)). 
 25 Id. (citing 52 U.S.C. § 10308(d)). 
 26 Id. at 911 (quoting 52 U.S.C. § 10310(e)). 
 27 See id. 
 28 Id. at 911–12. 
 29 Id. at 915–16. 
 In contrast, both Plaintiffs and the United States point to the vast sea of cases recognizing 
and affirming the private right of action within Section 2, usually without question. At the core of 
them all lies Morse v. Republican Party of Virginia,30 where the Supreme Court, albeit in a 
plurality opinion,31 held that “the existence of the private right of action under Section 2 has been 
clearly intended by Congress since 1965.”32 Since then, scores if not hundreds of cases have 

proceeded under the assumption that Section 2 provides a private right of action. All the while, 
Congress has consistently reenacted the VRA without making substantive changes, impliedly 
affirming the previously unanimous interpretation of Section 2 as creating a private right of 
action.33 In particular, Plaintiffs cite to Robinson v. Ardoin34—decided in the wake of Brnovich—
which recognized the court’s holding in Arkansas State while disagreeing with its outcome.35 
Ultimately, the Robinson court concluded that “[w]hile this issue has been flagged, it is undisputed 
that the Supreme Court and federal district courts have repeatedly heard cases brought by private 

 30 517 U.S. 186 (1996). 
 31 Justice Stevens wrote the main opinion, in which Justice Ginsburg joined. Justices Breyer, O’Connor, and 
Souter concurred without reaching the Section 2 issue. Morse also contains three dissents by Justices Thomas, 
Kennedy, and Scalia, respectively. 
 32 Id. at 232 (quoting S. Rep. No. 97–417, at 30) (ellipses omitted). The parties debate whether this statement 
is dicta or actually part of the holding. This dispute, however, is largely irrelevant in that the Court is “bound by 
Supreme Court dicta almost as firmly as by the Court’s outright holdings.” United States v. Nixon, 919 F.3d 1265, 
1273 (10th Cir. 2019). 
 33 See, e.g., Lorillard v. Pons, 434 U.S. 575, 580 (1978) (“Congress is presumed to be aware of an 
administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without 
change.”); cf Texas Dep’t of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc., 576 U.S. 519, 536 (2015) 
(“When it amended the FHA, Congress was aware of this unanimous precedent [interpreting the FHA]. And with that 
understanding, it made a considered judgment to retain the relevant statutory text.”). 
 34 605 F. Supp. 3d 759 (M.D. La. 2022), cert. granted before judgment, 142 S. Ct. 2892 (2022). 
 35 See id. at 819. 
plaintiffs under Section 2. Morse has not been overruled, and this Court will apply Supreme Court 
precedent.”36 
 In the end, the Court concludes that it has a choice before it. Option one—adhere to the 
extensive history, binding precedent, and implied Congressional approval of Section 2’s private 
right of action. Option two—conduct a searchingly thorough examination of Section 2’s text, 

legislative history, and the Sandoval analysis in an attempt to predict the Supreme Court’s future 
decisions. The Court chooses the former. The simple fact is that the Supreme Court explicitly 
recognized a private right of action under Section 2 in Morse. While that private right has been 
called into question by two Supreme Court justices, the Supreme Court has yet to overrule itself 
on that precise issue. Accordingly, until the Supreme Court or Tenth Circuit provide otherwise, 
the Court holds that Section 2 contains an implied private right of action. 
 2. Even if Section 2 did not create a private right of action, could Plaintiffs sue under 
§ 1983 for a violation of Section 2? 

 In general, “[o]nce a plaintiff demonstrates that a [federal] statute confers an individual 
right, the right is presumptively enforceable by § 1983.”37 For a statute to create a private right, 
the statutory language must show that it “ ‘confer[s] rights on a particular class of persons.’ ”38 If 
so, then a party “may rebut this presumption by showing that Congress specifically foreclosed a 
remedy under § 1983.”39 The party must show that “Congress shut the door to private enforcement 

 36 Id. (citations omitted); accord Singleton v. Merrill, 582 F. Supp. 3d 924 (N.D. Ala. 2022), order clarified, 
2022 WL 272637 (N.D. Ala. 2022), and appeal dismissed sub nom. Milligan v. Sec’y of State for Alabama, 2022 WL 
2915522 (11th Cir. 2022). Defendants point out that Robinson is currently on appeal before the Supreme Court. 
However, the Supreme Court did not grant certiorari on the Section 2 issue. See Ardoin v. Robinson, 142 S. Ct. 2892 
(2022) (granting certiorari). 
 37 Gonzaga Univ., 536 U.S. at 284. 
 38 Id. at 285 (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981). 
 39 Id. at 284 n.4 (further citation and quotations omitted). 
either expressly, through specific evidence from the statute itself, or impliedly, by creating a 
comprehensive enforcement scheme that is incompatible with individual enforcement under § 
1983.”40 
 In Turtle Mountain Band of Chippewa Indians v. Jaeger,41 the court examined Arkansas 
State, concluding that the Arkansas State court had written a “thorough and well-reasoned—

though admittedly, controversial—order.”42 However, the court reached a very different outcome 
than Arkansas State because it went on to analyze whether the plaintiff could assert a claim for 
violation of Section 2 under § 1983.43 Even though the court agreed with Arkansas State’s 
conclusion that Section 2 did not itself provide a private remedy, it went on to find that “[t]he plain 
language of Section 2 mandates that no government may restrict a citizen’s right to vote based on 
an individual’s race or color.”44 In the court’s opinion, “[i]t is difficult to imagine more explicit 
or clear rights creating language.”45 As such, the court held that there was a rebuttable presumption 
that Section 2 was enforceable under § 1983.46 
 Accordingly, the court turned to whether the Congress intended to foreclose § 1983 actions 
to enforce rights under the VRA.47 This intention may be found either by the statute itself 

providing a private remedy or through a “comprehensive enforcement scheme that is incompatible 

 40 Id. (further citations and quotations omitted). 
 41 2022 WL 2528256 (D.N.D. 2022). 
 42 Id. at *3. 
 43 Id. at *5. 
 44 Id. 
 45 Id. 
 46 Id. 
 47 Id. 
with individual enforcement.”48 Addressing the first method, the court once again recognized that 
“Section 2 does not contain any language creating a private remedy.”49 As to the second, the court 
found that Section 12, which authorizes the Attorney General to seek injunctions, fines, and 
imprisonment for violation of the VRA, was not incompatible with individual enforcement.50 
Indeed, “there has been private enforcement of Section 2 since the VRA’s inception.”51 

 The Court finds the reasoning in Turtle Mountain Band highly persuasive and applicable 
to this case. Not only does Section 2 contain clear rights-creating language—a legal position thus 
far unquestioned by any members of the Supreme Court—but it also does not contain a 
comprehensive enforcement scheme incompatible with individual enforcement. The extensive 
history of Section 2 enforcement by individuals, combined with Congress’s silence on the issue 
when reenacting the VRA, establishes this fact for the purposes of this Order. Accordingly, the 
Court finds that Plaintiffs may alternatively assert a Section 2 claim under § 1983. 
B. Plaintiffs have plausibly alleged a Section 2 claim. 
 In analyzing a motion to dismiss a Section 2 claim, court must perform a two-step analysis. 
First, courts must analyze the “necessary preconditions” set out in Thornburg v. Gingles.52 

Namely, plaintiffs must allege facts plausibly showing that: (1) “the minority group [can] 
demonstrate that it is sufficiently large and geographically compact to constitute a majority in a 

 48 Id. at *6 (quoting City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 120 (2005)); see also 
Blessing v. Freestone, 520 U.S. 329, 347 (1997) (“Only twice have we found a remedial scheme sufficiently 
comprehensive to supplant § 1983.”). 
 49 Turtle Mountain Band, 2022 WL 2528256, at *6. 
 50 Id. 
 51 Id. (citing, among others, Allen v. State Bd. of Elections, 393 U.S. 544, 555 (1969)) (further citation 
omitted). 
 52 478 U.S. 30, 50 (1986). 
single-member district”; (2) the minority group “is politically cohesive”; and (3) the minority 
group can “demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat 
the minority’s preferred candidate.”53 If the plaintiff satisfies this first step, courts must proceed 
to the second step—that is, determining under the totality of the circumstances whether “the 
political processes leading to nomination or election are not equally open to participation by 

members of a protected class in that its members have less opportunity than other members of the 
electorate to participate in the political process and to elect representatives of their choice.”54 
 1. Gingles—first precondition. 
 The Court begins by addressing whether Plaintiffs have sufficiently pleaded facts to 
establish the first Gingles precondition. “The first question, whether the minority group is 
‘sufficiently large and geographically compact to constitute a majority in a single-member district,’ 
simply asks whether any remedy is possible in the first instance.”55 Thus, “a § 2 plaintiff must 
also postulate a reasonable alternative voting practice to serve as the benchmark ‘undiluted’ voting 
practice.”56 Addressing this issue in Sanchez v. State of Colorado,57 the Tenth Circuit borrowed 

Justice Kennedy’s definition of “compactness” to hold “[t]he first Gingles condition refers to the 
compactness of the minority population, not to the compactness of the contested district.”58 It also 
considered a Hispanic population of 48.82% to be sufficiently large to satisfy this precondition.59 

 53 Id. at 50–51. 
 54 Id. at 43. 
 55 Sanchez v. State of Colo., 97 F.3d 1303, 1311 (10th Cir. 1996) (quoting Gingles, 478 U.S. at 50). 
 56 Reno v. Bossier Par. Sch. Bd., 520 U.S. 471, 480 (1997). 
 57 97 F.3d 1303 (10th Cir. 1996). 
 58 Id. at 1312 (quoting Bush v. Vera, 517 U.S. 952, 997 (1996) (Kennedy, J. concurring)). 
 59 Id. at 1314. 
Because the plaintiffs had proposed a feasible redistricting map where the Hispanic population 
could constitute a majority, the court held they had met the first precondition’s requirements.60 
 Defendants rely on League of United Latin American Citizens v. Abbott (LULAC II)61 for 
the proposition that Plaintiffs must submit a proposed districting map detailing their “five 
theoretical districts” to survive a motion to dismiss.62 After all, if a plaintiff cannot “establish that 

the minority has the potential to elect a representative of its own choice,”63 then he cannot show 
that a remedy is possible.64 Accordingly, the LULAC II court held that the plaintiff “must also 
allege that there are enough Hispanic voters in some reasonably configured hypothetical district to 
constitute a majority.”65 Based on this language, Defendants argue that Plaintiffs must identify 
within their Complaint how they propose to draw the districts to show that Latinos would comprise 
a CVAP majority within a district. 
 In response, Plaintiffs and the United States argue that proposed districts are not required 
at this stage in the case. Rather, they interpret Defendants’ argument as demanding a higher 
pleading standard for Section 2 plaintiffs than Rule 8—as interpreted by Twombly and Iqbal—

requires. Given that the main dispute between the parties is what Plaintiffs must factually allege 
at this stage, whether Plaintiffs have established the first Gingles precondition comes down to how 
the Court interprets Rule 8’s pleading requirements for a Section 2 claim. 

 60 Id. at 1315. 
 61 604 F. Supp. 3d 463 (W.D. Tex. 2022). 
 62 See id. at 497–98. 
 63 Growe v. Emison, 507 U.S. 25, 40 (1993). 
 64 LULAC II, 604 F. Supp. 3d at 495. 
 65 Id. at 498 (cleaned up). 
 Despite the lack of authority reaching this issue, the Court agrees with Plaintiffs—there is 
no demanding standard of factual specificity which they must meet to survive Defendants’ Motion. 
Under the Supreme Court’s holdings in Twombly and Iqbal, Rule 8 only requires a short and plain 
statement plausibly showing that Plaintiffs are entitled to relief. Thus, as recognized by the 
LULAC II court, all they need to plead to survive a motion to dismiss are “facts that would allow 

the Court to conclude a majority-minority district can be drawn.”66 After all, in LULAC II, the 
court did not dismiss the plaintiffs’ claims for failure to submit drawn districts within the 
complaint.67 Rather, the plaintiffs had not alleged any “specific facts,” such as the size of the 
Hispanic population, from which the court could plausibly infer that majority districts could be 
drawn.68 
 Here, Plaintiffs allege that the Latino population as of 2021 comprises 59.02% of the 
overall population and 46.13% of the CVAP. This meets the sufficiently large standard under the 
Tenth Circuit’s holding in Sanchez. Furthermore, Plaintiffs’ population heat map shows that the 
Latino population resides primarily in the southeast part of Dodge City. Between the alleged 

CVAP estimates and the population heat map, the Court can reasonably infer that the Latino 
population is geographically compact such that a district could be drawn with a Latino majority. 
 It seems a step too far to require Plaintiffs to submit an actual proposed district plan at this 
stage. While that will be necessary should their claim reach summary judgment, nothing more is 
required now. Accordingly, Plaintiffs have alleged facts plausibly establishing the first Gingles 
precondition. 

 66 Id. (emphasis added). 
 67 See id. 
 68 Id. (quoting Shaw v. Villanueva, 918 F.3d 414, 418 (5th Cir. 2019)). 
 2. Gingles—second precondition. 
 To establish the second Gingles precondition, Plaintiffs must plausibly allege that Latinos 
in Dodge City vote cohesively as a group. Obviously, courts “may not assume from a group of 
voters’ race that they think alike, share the same political interests, and will prefer the same 
candidates at the polls.”69 And courts may not accept the mere recitation of a claim’s elements as 

true under a motion to dismiss standard.70 Defendants argue that Plaintiff’s claim must fail because 
they rely entirely on bare legal conclusions without factual support. 
 Plaintiffs, however, do more than merely recite threadbare conclusions. Instead, Plaintiffs 
factually allege that five Latino-preferred candidates have run for office since 2000, reaping a 
majority vote in high-density Latino precincts while receiving low support in non-Latino precincts. 
From these facts, Plaintiffs have plausibly alleged that the Latino population votes cohesively. 
Contrary to the thrust of Defendants’ argument, Plaintiffs need not prove their entire case within 
their Complaint. Indeed, Defendants fail to cite to any cases requiring more in a complaint than 
Plaintiffs have alleged here. Plaintiffs’ alleged facts, while general in nature, nevertheless suffice 

at this stage to show political cohesion. Plaintiffs, therefore, have established the second Gingles 
precondition for the purpose of this Order. 
 3. Gingles—third precondition. 
 Finally, Plaintiffs must establish that the white majority votes as a bloc sufficient to defeat 
the Latino-preferred candidates. Once again, Plaintiffs point to the elections in 2000, 2006, 2014, 
2017, and 2021 where specified candidates who received many votes in Latino-dense precincts 

 69 League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 433 (2006) (further citation, quotations, and 
brackets omitted). 
 70 See Iqbal, 556 U.S. at 678; see also LULAC II, 604 F. Supp. 3d at 499. 
were nevertheless defeated because of their consistently low support in white-majority precincts. 
Once again, Defendants argue that these allegations are insufficient to state a Section 2 claim. And 
once again, the Court reminds Defendants that the standard at this stage in the litigation is not as 
high as they think. By alleging facts showing that the Latino-preferred candidates were defeated 
by white voters despite receiving high numbers of vote from Latino-dense precincts, Plaintiffs 

have plausibly alleged that white voters voted as a bloc to defeat the Latino-preferred candidates. 
Naturally, they will have to prove this element some other time, at which point specified data 
regarding voting numbers, results, etc. will become important. But for now, Plaintiffs have met 
each of the Gingles preconditions. 
 4. Gingles—second step, i.e., totality of the circumstances analysis. 
 Because each of the preconditions have been met, the Court must address Gingles’ second 
step—whether the totality of the circumstances show “the political processes leading to 
nomination or election are not equally open to participation by members of a protected class in 
that its members have less opportunity than other members of the electorate to participate in the 
political process and to elect representatives of their choice.”71 Defendants fail to make any 

argument on this subject at all. Plaintiffs even point out the lack of argument on this issue in their 
Response, with Defendants’ Reply remaining similarly silent. Accordingly, the Court considers 
Defendants to have waived any argument regarding the Gingles second step for the purposes of 
this Order.72 Thus, Plaintiffs have established both Gingles steps necessary to survive a motion to 
dismiss. Defendants’ Motion as to Plaintiff’s Section 2 claim is therefore denied. 

 71 Gingles, 478 U.S. at 43. 
 72 See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998) (“Arguments inadequately briefed 
in the opening brief are waived.”). 
C. Plaintiffs have plausibly alleged a claim for violation of the Equal Protection Clause. 
 Defendants also move to dismiss Plaintiffs’ claims under § 1983 for violation of the 
Fourteenth Amendment’s Equal Protection Clause. To show a violation of the Equal Protection 
Clause, “[p]roof of racially discriminatory intent or purpose is required.”73 Defendants restrict 
their brief to arguing whether Plaintiffs have sufficiently alleged discriminatory intent necessary 

to support an Equal Protection claim. They begin by recognizing that K.S.A. § 12-184b(b) and 
K.S.A. § 12-184(a)–(b) provide that ultimately the City’s citizens decide whether to abandon the 
commission-manager form of government. Defendants argue that Plaintiffs must allege facts 
showing that Dodge City private citizens discriminatorily intended to dilute the Latino vote by 
maintaining the current voting scheme. In Defendants’ view, only the citizenry’s intent is relevant 
because only they have the power to change Dodge City’s commission-manager form of 
government. 
 But theses statutes deal only with the form of government—not the method of electing 
officers within that government. Defendants do not attempt to explain how the City’s at-large 

election system is inseparable from its chosen form of government. Plaintiffs’ Complaint does not 
appear to challenge the commissioner-manager form of government but rather how commissioners 
are elected to the Commission. As such, the Court finds Defendants’ argument about Dodge City 
citizenry’s discriminatory intent irrelevant. 
 Citing a district court case, Georgia State Conf. of NAACP v. Georgia,74 Defendants also 
argue that Plaintiffs must show both that the at-large election scheme was originally adopted with 

 73 Blum, 457 U.S. at 1004. 
 74 269 F. Supp. 3d 1266 (N.D. Ga. 2017). 
a discriminatory purpose and that is has a discriminatory effect. In contrast, Plaintiffs quote the 
Supreme Court’s holding in Rogers v. Lodge75 “that multimember districts violate the Fourteenth 
Amendment if conceived or operated as purposeful devices to further racial discrimination.”76 
Defendants offer no response to this language and appear to concede the point in their Reply. 
Thus, the Court holds that Plaintiffs need not offer factual allegations of the Commission’s 

discriminatory intent at the time the at-large election scheme was adopted. 
 Finally, the Court may reach the primary issue here—whether Defendants had the requisite 
intent in operating the at-large election scheme to further racial discrimination. In Village of 
Arlington Heights v. Metro. Housing Development Corp.,77 the Supreme Court recognized that 
proving racial discrimination necessitates “a sensitive inquiry into such circumstantial and direct 
evidence of intent as may be available.”78 With that in mind, the Supreme Court articulated several 
factors for courts to consider in determining whether a plaintiff has established discriminatory 
intent.79 
 However, the Court need not analyze these factors simply because Defendants do not 

address Plaintiffs’ argument that they have established an inference of discriminatory intent on the 
part of Defendants. As such, Defendants have waived any argument regarding this issue for the 
purposes of this Order. Defendants give no other reason besides those discussed above as to why 

 75 458 U.S. 613 (1982). 
 76 Id. at 617 (emphasis added) (further citation and quotation omitted). 
 77 429 U.S. 252 (1977). 
 78 Id. at 266. 
 79 Id. at 267–68. 
Plaintiffs’ Equal Protection claim should be dismissed. Accordingly, Defendants’ Motion as to 
this claim is denied. 
D. Plaintiffs’ Fifteenth Amendment must be dismissed. 
 Finally, Defendants move to dismiss Plaintiffs’ Fifteenth Amendment claim. Defendants 
contend that a voting dilution claim under the Fifteenth Amendment has never been recognized by 

either the Supreme Court or the Tenth Circuit.80 Plaintiffs do not dispute this fact, instead arguing 
that this silence does not foreclose such claims. Regardless, the parties recognize in the few 
circuits that do recognize a Fifteenth Amendment vote dilution claim, it is “essentially congruent 
with vote-dilution claims under the Fourteenth Amendment.”81 
 The Court sees no reason to recognize a claim which neither the Tenth Circuit nor the 
Supreme Court have recognized up to this point. Even if it did, the parties agree there is no 
practical legal difference between Plaintiffs’ Fourteenth Amendment claim and their Fifteenth 
Amendment claim. Likewise, Plaintiff’s remedy would remain the same whether or not its 
succeeded on its Fifteenth Amendment claim as well as its Fourteenth Amendment claim. Thus, 

Plaintiff obtains no benefit by asserting a Fifteenth Amendment claim in this case and will suffer 
no detriment by the Court dismissing it now. Accordingly, the Court grants Defendants’ Motion 
as to Plaintiffs’ Fifteenth Amendment claim. 

 80 See, e.g., Reno, 528 U.S. at 334 n.3 (“[W]e have never held that vote dilution violates the Fifteenth 
Amendment.”). 
 81 Backus v. South Carolina, 857 F. Supp. 2d 553, 569 (D.S.C. 2012), aff’d, 568 U.S. 801 (2012) (citing 
Washington v. Finlay, 664 F.2d 913, 919 (4th Cir. 1981). 
 IT IS THEREFORE ORDERED that Defendants’ Motion to Dismiss (Doc. 37) is 
GRANTED in part and DENIED in part. 
 IT IS SO ORDERED. 
 Dated this 18th day of April, 2023. 

 ERIC F. MELGREN 
 CHIEF UNITED STATES DISTRICT JUDGE 

 -2]-